UNITED STATES *v.* KAHN ET UX.

No. 72–1328.  Argued December 11–12, 1973—
Decided February 20, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 158.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen, Harriet S. Shapiro,* and *Jerome M. Feit.*

*Anna R. Lavin* argued the cause for respondents. With her on the brief was *Edward J. Calihan, Jr.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On March 20, 1970, an attorney from the United States Department of Justice submitted an application for an order authorizing a wiretap interception pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520, to Judge William J. Campbell of the United States District Court for the Northern District of Illinois. The affidavit accompanying the application contained information indicating that respondent Irving Kahn was a bookmaker who operated from his residence and used two home telephones to conduct his business.[1] The

_____
[1] The affiant, a special agent of the Federal Bureau of Investigation, provided detailed information about Kahn's alleged gambling activities: This information was derived from the personal observations of three unnamed sources, whose past reliability in gambling

affidavit also noted that the Government's informants had stated that they would refuse to testify against Kahn, that telephone company records alone would be insufficient to support a bookmaking conviction, and that physical surveillance or normal search-and-seizure techniques would be unlikely to produce useful evidence. The application therefore concluded that "normal investigative procedures reasonably appear to be unlikely to succeed," and asked for authorization to intercept wire communications of Irving Kahn and "others as yet unknown" over two named telephone lines, in order that information concerning the gambling offenses might be obtained.

Judge Campbell entered an order, pursuant to 18 U. S. C. § 2518, approving the application.[2] He specifi-

---

investigations was described by the affiant. In addition, the information was corroborated by telephone company records showing calls on Kahn's telephones to and from a known gambling figure in another State.

The Government's application and the accompanying affidavit also claimed that one Jake Jacobs was using a telephone at his private residence to conduct an illegal gambling business. The subsequent order of the District Court authorizing wire interceptions also covered Jacobs' phone. Any communications intercepted over the Jacobs telephone, however, play no role in the issues now before us.

[2] Title 18 U. S. C. § 2518 provides in pertinent part:

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

.          .          .          .          .

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a par-

146

cally found that there was probable cause to believe that Irving Kahn and "others as yet unknown" were using the two telephones to conduct an illegal gambling

---

ticular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

.    .    .    .    .

"(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

"(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

"(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

"(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

"(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

"(a) the identity of the person, if known, whose communications are to be intercepted;

"(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

"(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

"(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

"(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained."

business, and that normal investigative techniques were unlikely to succeed in providing federal officials with sufficient evidence to successfully prosecute such crimes. The order authorized special agents of the FBI to "intercept wire communications of Irving Kahn and others as yet unknown" to and from the two named telephones concerning gambling activities.

The authorization order further provided that status reports were to be filed with Judge Campbell on the fifth and 10th days following the date of the order, showing what progress had been made toward achievement of the order's objective, and describing any need for further interceptions.[3] The first such report, filed with Judge Campbell on March 25, 1970, indicated that the wiretap had been terminated because its objectives had been attained. The status report gave a summary of the information garnered by the interceptions, stating in part that on March 21 Irving Kahn made two telephone calls from Arizona to his wife at their home in Chicago and discussed gambling wins and losses, and that on the same date Minnie Kahn, Irving's wife, made two telephone calls from the intercepted telephones to a person described in the status report as "a known gambling figure," with whom she discussed various kinds of betting information.

Both Irving and Minnie Kahn were subsequently indicted for using a facility in interstate commerce to promote, manage, and facilitate an illegal gambling busi-

---

[3] Title 18 U. S. C. § 2518 (6) provides in pertinent part:

"Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require."

ness, in violation of 18 U. S. C. § 1952.[4]  The Government prosecutor notified the Kahns that he intended to introduce into evidence at trial the conversations intercepted under the court order.  The Kahns in turn filed motions to suppress the conversations.  These motions were heard by Judge Thomas R. McMillen in the Northern District of Illinois, who, in an unreported opinion, granted the motion to suppress.  He viewed any conversations between Irving and Minnie Kahn as within the "marital privilege," and hence inadmissible

---

[4] The Travel Act, 18 U. S. C. § 1952, provides:

"(a)  Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1)  distribute the proceeds of any unlawful activity; or

"(2)  commit any crime of violence to further any unlawful activity; or

"(3)  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

"and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b)  As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 102 (6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

"(c)  Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury."

The indictment in this case stated that the alleged gambling activities attributed to the Kahns were in violation of Ill. Rev. Stat., c. 38, §§ 28–1 (a), (2), and (10).

at trial.[5]   In addition, all other conversations in which Minnie Kahn was a participant were suppressed as being outside the scope of Judge Campbell's order, on the ground that Minnie Kahn was not a person "as yet unknown" to the federal authorities at the time of the original application.

The Government filed an interlocutory appeal from the suppression order.[6]   A divided panel of the United States Court of Appeals for the Seventh Circuit affirmed that part of the District Court's order suppressing all conversations of Minnie Kahn, but reversed that part of the order based on the marital privilege.   471 F. 2d 191.   The court held that under the wiretap order all intercepted conversations had to meet two requirements before they could be admitted into evidence:

> "(1) that Irving Kahn be a party to the conversations, and (2) that his conversations intercepted be with 'others as yet unknown.' "   *Id.,* at 195.

The court then construed the statutory requirements of 18 U. S. C. §§ 2518 (1)(b)(iv) and 2518 (4)(a) that the person whose communications are to be intercepted is to be identified if known, as excluding from the term "others as yet unknown" any "persons [who] careful investigation by the government would disclose were probably using the Kahn telephones in conversations for illegal activities."   *Id.,* at 196.   Since the Government in this case had not shown that further investi-

---

[5] Title 18 U. S. C. § 2517 (4) provides that:

"No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character."

[6] Title 18 U. S. C. § 2518 (10)(b) gives the United States the right to take an interlocutory appeal from an order granting a motion to suppress intercepted wire communications.   In addition, 18 U. S C. § 3731 generally provides for appeals by the Government from pretrial orders suppressing evidence.

gation of Irving Kahn's activities would not have implicated Minnie in the gambling business, the Court of Appeals felt that Mrs. Kahn was not a "person as yet unknown" within the purview of Judge Campbell's order.

We granted the Government's petition for certiorari, 411 U. S. 980, in order to resolve a seemingly important issue involving the construction ·of this relatively new federal statute.[7]

At the outset, it is worth noting what issues are not involved in this case. First, we are not presented with an attack upon the constitutionality of any part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Secondly, review of this interlocutory order does not involve any questions as to the propriety of the Justice Department's internal procedures in authorizing the application for the wiretap.[8] Finally, no argument is presented that the federal agents failed to conduct the wiretap here in such a manner as to minimize the interception of innocent conversations.[9] The question presented is simply whether the conversations that the Government wishes to introduce into evidence at the respondents' trial are made inadmissible by the "others as yet unknown" language of Judge Campbell's order or by the corresponding statutory requirements of Title III.

---

[7] The Kahns' cross-petition for certiorari, raising the marital privilege argument, was denied. 411 U. S. 986.

[8] Such issues are currently *sub judice* in *United States* v. *Giordano*. No. 72–1057, and *United States* v. *Chavez*, No. 72–1319.

[9] In relevant part, 18 U. S. C. § 2518 (5) requires:

"Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."

In deciding that Minnie Kahn was not a person "as yet unknown" within the meaning of the wiretap order, the Court of Appeals relied heavily on an expressed objective of Congress in the enactment of Title III: the protection of the personal privacy of those engaging in wire communications.[10]   In light of this clear congressional concern, the Court of Appeals reasoned, the Government could not lightly claim that a person whose conversations were intercepted was "unknown" within the meaning of Title III.   Thus, it was not enough that Mrs. Kahn was not known to be taking part in any illegal gambling business at the time that the Government applied for the wiretap order; in addition, the court held that the Government was required to show that such complicity would not have been discovered had a thorough investigation of Mrs. Kahn been conducted before the wiretap application.

In our view, neither the legislative history nor the specific language of Title III compels this conclusion. To be sure, Congress was concerned with protecting individual privacy when it enacted this statute.   But it is also clear that Congress intended to authorize electronic surveillance as a weapon against the operations of organized crime.[11]   There is, of course, some tension between these two stated congressional objectives, and the question of how Congress struck the balance in any particular instance cannot be resolved simply through general reference to the statute's expressed concern for the protection of individual privacy.   Rather, the starting point, as in all statutory construction, is the precise wording chosen by Congress in enacting Title III.

---

[10] See Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, Tit. III, §§ 801 (b) and (d), 82 Stat. 211; S. Rep. No. 1097, 90th Cong., 2d Sess., 66.

[11] See § 801 (c) of the above Act, 82 Stat. 211; S. Rep. No. 1097, *supra,* at 66–76.

Section 2518 (1) of Title 18 U. S. C. sets out in detail the requirements for the information to be included in an application for an order authorizing the interception of wire communications. The sole provision pertaining to the identification of persons whose communications are to be intercepted is contained in § 2518 (1)(b)(iv), which requires that the application state "the identity of the person, if known, *committing the offense* and whose communications are to be intercepted." (Emphasis supplied.) This statutory language would plainly seem to require the naming of a specific person in the wiretap application only when law enforcement officials believe that such an individual is actually committing one of the offenses specified in 18 U. S. C. § 2516. Since it is undisputed here that Minnie Kahn was not known to the Government to be engaging in gambling activities at the time the interception order was sought, the failure to include her name in the application would thus seem to comport with the literal language of § 2518 (1)(b)(iv).

Moreover, there is no reason to conclude that the omission of Minnie Kahn's name from the actual wiretap order was in conflict with any of the provisions of Title III. Section 2518 (4)(a) requires that the order specify "the identity of the person, if known, whose communications are to be intercepted." Since the judge who prepares the order can only be expected to learn of the target individual's identity through reference to the original application, it can hardly be inferred that this statutory language imposes any broader requirement than the identification provisions of § 2518 (1)(b)(iv).

In effect, the Court of Appeals read these provisions of § 2518 as if they required that the application and order identify "all persons, known or discoverable, who are committing the offense and whose communications are to be intercepted." But that is simply not what

the statute says: identification is required only of those "known" to be "committing the offense." Had Congress wished to engraft a separate requirement of "discoverability" onto the provisions of Title III, it surely would have done so in language plainer than that now embodied in § 2518.

Moreover, the Court of Appeals' interpretation of § 2518 would have a broad impact. A requirement that the Government fully investigate the possibility that any likely user of a telephone was engaging in criminal activities before applying for an interception order would greatly subvert the effectiveness of the law enforcement mechanism that Congress constructed. In the case at hand, the Court of Appeals' holding would require the complete investigation, not only of Minnie Kahn, but also of the two teen-aged Kahn children and other frequenters of the Kahn residence before a wiretap order could be applied for. If the telephone were in a store or an office, the Government might well be required to investigate everyone who had access to it—in some cases, literally hundreds of people—even though there was no reason to suspect that any of them were violating any criminal law. It is thus open to considerable doubt that such a requirement would ultimately serve the interests of individual privacy. In any event, the statute as actually drafted contains no intimation of such total investigative demands.[12]

---

[12] It is true, as the Court of Appeals noted, that 18 U. S. C. §§ 2518 (1) (c) and 2518 (3) (c) require the application to demonstrate, and the judge authorizing any wire interception to find, that "normal investigative procedures" have either failed or appear unlikely to succeed. This language, however, is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. See generally S. Rep. No. 1097, 90th Cong., 2d Sess., 101. Once the necessity for the interception has been shown, §§ 2518 (1) (c) and 2518 (3) (c) do not impose an additional requirement that the Gov-

In arriving at its reading of § 2518, the Court of Appeals seemed to believe that taking the statute at face value would result in a wiretap order amounting to a "virtual general warrant," since the law enforcement authorities would be authorized to intercept communications of anyone who talked on the named telephone line. 471 F. 2d, at 197. But neither the statute nor the wiretap order in this case would allow the federal agents such total unfettered discretion. By its own terms, the wiretap order in this case conferred authority to intercept only communications "concerning the above-described [gambling] offenses." [13] Moreover, in accord with the statute the order required the agents to execute the warrant in such a manner as to minimize the interception of any innocent conversations.[14] And the order limited the length of any possible interception to 15 days, while requiring status reports as to the progress of the wiretap to be submitted to the District Judge every five days, so that any possible abuses might be quickly discovered and halted. Thus, the failure of the order to specify that Mrs. Kahn's conversations might be the subject of interception hardly left the executing agents free to seize at will every communi-

___

ernment investigate all persons who may be using the subject telephone in order to determine their possible complicity.

[13] Title 18 U. S. C. § 2518 (4) (c) requires that an order authorizing wire interceptions contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." See also 18 U. S. C. § 2518 (1) (b) (iii), imposing a similar requirement as to the application for a wiretap order.

But cf. 18 U. S. C. § 2517 (5), providing that under certain circumstances intercepted conversations involving crimes other than those identified in the order may be used in evidence.

[14] See n. 9, *supra*.

cation that came over the wire—and there is no indication that such abuses took place in this case.[15]

We conclude, therefore, that Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is "committing the offense" for which the wiretap is sought. Since it is undisputed that the Government had no reason to suspect Minnie Kahn of complicity in the gambling business before the wire interceptions here began, it follows that under the statute she was among the class of persons "as yet unknown" covered by Judge Campbell's order.

The remaining question is whether, under the actual language of Judge Campell's order, only those intercepted conversations to which Irving Kahn himself was

---

[15] The fallacy in the Court of Appeals' "general warrant" approach may be illustrated by examination of an analogous conventional search and seizure. If a warrant had been issued, upon a showing of probable cause, to search the Kahn residence for physical records of gambling operations, there could be no question that a subsequent seizure of such records bearing Minnie Kahn's handwriting would be fully lawful, despite the fact that she had not been identified in the warrant or independently investigated. In fact, as long as the property to be seized is described with sufficient specificity, even a warrant failing to name the owner of the premises at which a search is directed, while not the best practice, has been held to pass muster under the Fourth Amendment. See *Hanger* v. *United States*, 398 F. 2d 91, 99 (CA8); *Miller* v. *Sigler*, 353 F. 2d 424, 428 (CA8) (dictum); *Dixon* v. *United States*, 211 F. 2d 547, 549 (CA5); *Carney* v. *United States*, 79 F. 2d 821, 822 (CA6); *United States* v. *Fitzmaurice*, 45 F. 2d 133, 135 (CA2) (L. Hand, J.); Mascolo, Specificity Requirements for Warrants under the Fourth Amendment: Defining the Zone of Privacy, 73 Dick. L. Rev. 1, 21. See also *United States* v. *Fiorella*, 468 F. 2d 688, 691 (CA2) ("The Fourth Amendment requires a warrant to describe only 'the place to be searched, and the persons or things to be seized,' not the persons from whom things will be seized").

a party are admissible in evidence at the Kahns' trial, as the Court of Appeals concluded. The effect of such an interpretation of the wiretap order in this case would be to exclude from evidence the intercepted conversations between Minnie Kahn and the "known gambling figure" concerning betting information. Again, we are unable to read either the District Court order or the underlying provisions of Title III as requiring such a result.

The order signed by Judge Campbell in this case authorized the Government to "intercept wire communications of Irving Kahn and others as yet unknown . . . to and from two telephones, subscribed to by Irving Kahn." The order does not refer to conversations *between* Irving Kahn and others; rather, it describes "communications *of* Irving Kahn and others as yet unknown" to and from the target telephones. To read this language as requiring that Irving Kahn be a party to every intercepted conversation would not only involve a substantial feat of verbal gymnastics, but would also render the phrase "and others as yet unknown" quite redundant, since Kahn perforce could not communicate except with others.

Moreover, the interpretation of the wiretap authorization adopted by the Court of Appeals is at odds with one of the stated purposes of Judge Campbell's order. The District Judge specifically found that the wiretap was needed to "reveal the identities of [Irving Kahn's] confederates, their places of operation, and the nature of the conspiracy involved." It is evident that such information might be revealed in conversations to which Irving Kahn was not a party. For example, a confederate might call in Kahn's absence, and leave either a name, a return telephone number, or an incriminating message. Or, one of Kahn's associates might himself

come to the family home and employ the target telephones to conduct the gambling business.[16] It would be difficult under any circumstances to believe that a District Judge meant such intercepted conversations to be inadmissible at any future trial; given the specific language employed by Judge Campbell in the wiretap order today before us, such a conclusion is simply untenable.

Nothing in Title III requires that, despite the order's language, it must be read to exclude Minnie Kahn's communications. As already noted, 18 U. S. C. §§ 2518 (1)(b)(iv) and 2518 (4)(a) require identification of the person committing the offense only "if known." The clear implication of this language is that when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute.[17] It necessarily follows that Congress could not have intended that the authority to intercept must be limited to those conversations *between* a party named in the order and others, since at least in some cases, the order might not name any specific party at all.[18]

---

[16] By referring to the conversations of Kahn and others "to and from" the two telephones, the order clearly envisioned that the "others" might be either receiving or transmitting gambling information *from* the two Kahn telephones. Yet it could hardly be expected in these instances that Irving Kahn would always be the person on the other end of the line, especially since either bettors or Kahn's confederates in the gambling business might often have occasion to dial the telephone numbers in issue.

[17] Such a situation might obtain if a bettor revealed to law enforcement authorities that he had repeatedly called a certain telephone number in order to place wagers, but had never been told the name of the person at the other end of the line.

[18] In fact, the Senate rejected an amendment to Title III that would have provided that only the conversations of those specifically named

For these reasons, we hold that the Court of Appeals was in error when it interpreted the phrase "others as yet unknown" so as to exclude conversations involving Minnie Kahn from the purview of the wiretap order. We further hold that neither the language of Judge Campbell's order nor that of Title III requires the suppression of legally intercepted conversations to which Irving Kahn was not himself a party.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting.

As a result of our decision in *Berger* v. *New York*, 388 U. S. 41, a wiretap—long considered to be a special kind of a "search" and "seizure"—was brought under the reach of the Fourth Amendment.[1] The dominant feature of that Amendment was the command that "no Warrants shall issue, but upon probable cause"—a requirement which Congress wrote into 18 U. S. C. § 2518.[2]

---

in the wiretap order could be admitted into evidence. 114 Cong. Rec. 14718 (1968) (Amendment 735).

[1] Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] Title 18 U. S. C. § 2518 provides in pertinent part:

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

By § 2518 (3), the judge issuing the warrant must be satisfied by the facts submitted by the police that there is "probable cause" for belief that "an individual" is committing the described offense, § 2518 (3)(a); that there is "probable cause" for belief that particular communications concerning the offense will be attained by interception, § 2518 (3)(b); that normal investigative procedures have been tried but have failed or reasonably appear to be unlikely to succeed or to be too dangerous, § 2518 (3)(c), and that there is "probable cause" for belief that named facilities are being used or are about to be used in the commission of the named offense, § 2518 (3) (d). The Act goes on to state that the judge must specify "the identity of the person, if known, whose communications are to be intercepted." § 2518 (4)(a).

The judge in the present case described the telephones

---

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

.          .          .          .

"(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

.          .          .          .          .

"(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

.          .          .          .          .

"(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

"(a) the identity of the person, if known, whose communications are to be intercepted."

to be tapped and found probable cause to believe "Irving Kahn and others as yet unknown" were connected with the commission of specified interstate crimes. The judicial order authorized special federal agents to "intercept wire communications of Irving Kahn and others as yet unknown" concerning these crimes.

The agents intercepted incriminating calls made by Irving Kahn and also incriminating calls made by his wife, Minnie Kahn. The District Court on motions to suppress disallowed use of the conversations of Minnie Kahn; and the Court of Appeals agreed, saying that the probable-cause order made it necessary for the Government to meet two requirements: (1) "that Irving Kahn be a party to the conversations, and (2) that his conversations intercepted be with 'others as yet unknown,' " 471 F. 2d 191, 195. That seems to be a commonsense interpretation, for Irving Kahn when using a phone talks not to himself but with "others" who at the time were "unknown." To construe the warrant as allowing a search of the conversations of anyone putting in calls on the Kahn telephone amounts, as the Court of Appeals said, "to a virtual general warrant in violation" of Mrs. Kahn's rights, *id.,* at 197.

Whether the search would satisfy the Fourth Amendment is not before us, the decision below being based solely on the Act of Congress. Seizure of the words of Mrs. Kahn is not specified in the warrant. The narrow scope of the search that was authorized was limited to Mr. Kahn and those whom he called or who called him.

Congress in passing the present Act legislated, of course, in light of the general warrant. The general warrant historically included a license to search for everything in a named place as well as a license to search all and any places in the discretion of the officers.

*Frisbie* v. *Butler*, 1 Kirby 213 (Conn.) ; [3] Quincy's Mass. Rep. 1761–1772, App. I.

In light of the prejudice against general warrants which I believe Congress shared,[4] I would not allow Mrs.

[3] The warrant in the *Frisbie* case read in relevant part:

"[Y]ou are commanded forthwith to search all suspected places and persons that the complainant thinks proper, to find his lost pork, and to cause the same, and the person with whom it shall be found, or suspected to have taken the same, and have him to appear before some proper authority, to be examined according to law." 1 Kirby 213–214.

The Court ruled:

"With regard to the warrant—Although it is the duty of a justice of the peace granting a search warrant (in doing which he acts judicially) to limit the search to such particular place or places, as he, from the circumstances, shall judge there is reason to suspect; and the arrest to such person or persons as the goods shall be found with: And the warrant in the present case, being general, to search all places, and arrest all persons, the complainant should suspect, is clearly illegal"; *id.*, at 215.

[4] The explicit requirements of the wiretapping provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. § 2510 *et seq.*, and their legislative history manifest a congressional effort to prevent law enforcement agents from proceeding by way of general search warrants. Section 2518 (4) (a), of course, requires that a wiretap authorization order identify the person, if known, whose communications are to be intercepted. Sections 2518 (4) (b) and (c) require that the order also specify the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted, and also particularly describe the type of communication to be intercepted and the particular offense to which it relates. Congress also provided that no order "may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization." § 2518 (5). An authorization order, moreover, must specify that the electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." *Ibid.*

Before a wiretap order can issue, Title III also demands that law enforcement officers applying for the order provide the judge

Kahn's conversations to be impliedly covered by the warrant, for to do so allows a search of the entire list of outgoing and incoming calls to the Kahn telephones, even though no showing of probable cause had been made concerning any member of the household other than Mr. Kahn.

I cannot believe that Congress sanctioned that practice.

In the first place, though the agents just heard Mrs. Kahn using the phone on March 21 and though they continued their surveillance until March 25, they took no steps to broaden the warrant to include Mrs. Kahn.[5]

with information describing the offense, the facility, the type of communication, and the identity of the person, if known, committing the offense and whose communications are to be intercepted, § 2518 (1) (b), because in the view of Congress "[e]ach of these requirements reflects the constitutional command of particularization." S. Rep. No. 1097, 90th Cong., 2d Sess., 101. Furthermore, § 2518 (3) requires the judge, before issuing a wiretap order, to find that there is probable cause to believe that an individual is involved with a particular offense, that particular communications concerning that offense will be intercepted, and that specific facilities are being used or are about to be used in connection with the commission of such offense, or are leased to, listed to, or commonly used by the individual. Congress inserted these provisions because it felt that, with them, "the order will link up specific person, specific offense, and specific place. Together they are intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity." S. Rep. No. 1097, *supra,* at 102.

See also *id.,* at 74–75; 114 Cong. Rec. 14712, 14750 (remarks of Sen. McClellan); *id.,* at 14728 (Sen. Tydings); *id.,* at 14715 (Sen. Tower); *id.,* at 14763 (Sen. Percy); *id.,* at 14748 (Sen. Mundt).

[5] If the statement made by Mrs. Kahn on the telephone March 21 was incriminating, there would be a question whether it could be the basis for obtaining a broadening of the warrant to include her without violating *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. In that case papers had been seized by officers

There was time[6] to obtain a warrant concerning Mrs. Kahn. I assume that one could have been obtained between March 21 and March 25. Then a judge would have decided the particularity of the search of the Kahn household.

Under today's decision a wiretap warrant apparently need specify but one name and a national dragnet becomes operative. Members of the family of the suspect, visitors in his home, doctors, ministers, merchants, teachers, attorneys, and everyone having any possible connection with the Kahn household are caught up in this web.

I would affirm the judgment below.

---

in violation of the parties' Fourth Amendment rights but used by the officials as a basis for demanding in proper form that the owners produce the papers. Mr. Justice Holmes, speaking for the Court, rejected that procedure, saying:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course, this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." *Id.*, at 392.

[6] Cf. *Johnson* v. *United States*, 333 U. S. 10; *United States* v. *Di Re*, 332 U. S. 581; *Trupiano* v. *United States*, 334 U. S. 699.