OPINION OF THE COURT
Harold J. Rothwax, J.
The defendant herein, Angelo Tomao, has been indicted for the crimes of grand larceny in the first degree by *400 extortion (Penal Law, § 155.40) and criminal usury in the second degree (Penal Law, § 190.40). The defendant moves to suppress as evidence certain electronically recorded telephone conversations to which he was a party, seized pursuant to an eavesdropping warrant issued on September 21, 1982 by the Hon. Milton Mollen, Presiding Justice of the Appellate Division, Second Department, and pursuant to extensions of the original warrant issued on October 20, November 19, and December 8, 1982 and on January 6, and February 4, 1983, The September 21 warrant authorized interception of conversations over a telephone subscribed to by Pell Shell Key Food located in Queens County. The defendant was also intercepted over listening devices installed, pursuant to warrant, on the premises of Key Food on November 8, 1982 and on the premises of a pastry shop located in New York County on January 17, 1983. The defendant does not challenge the legality of the interceptions over the listening devices, except insofar as the subsequent warrants were based upon information derived from the Key Food wiretap.
The defendant bases his motion to suppress (CPL 710.20, subd 2) on numerous grounds: (1) that there was no probable cause to believe that he was committing or would commit the designated offenses of criminal usury and conspiracy; (2) that there was no probable cause to believe that the Key Food telephone was being or would be used in connection with the commission of such offenses; and (3) that the executing officers, in any event, intercepted the allegedly incriminating conversations as a result of their failure to minimize nonpertinent interceptions (CPL 700.15, subds 2, 5; 700.30, subd 7).
PROBABLE CAUSE
The eavesdropping warrant at issue here was largely derived from conversations intercepted pursuant to a previous warrant issued by Justice Mollen on March 23, 1982, for the interception of conversations of John Montalbano with accomplices and coconspirators, pertaining to the crimes of usury and conspiracy, over Montalbano’s home telephone in Queens County. The initial Montalbano warrant stemmed from an encounter between Montalbano and an undercover detective in which Montalbano offered *401 to lend $100,000 at usurious rates. Montalbano disclosed that he obtained the money he loaned from others to whom he was accountable. This meeting served to corroborate information, disclosed by an informant of known reliability, that Montalbano managed some $200,000 belonging to organized crime figures, for the purpose of making loans at usurious rates. Documents and consensual recordings with Montalbano, made by the informant, revealed the names of some of Montalbano’s borrowers, the terms of the loans, and the use of Montalbano’s home telephone to conduct his lending activities and to report the status of loans to one Nicholas Frustaci. Other consent recordings made by the informant established that Montalbano also received money to make loans from one Anthony Federici. Frustaci and Federici were reputed crime figures connected to different organizations. Eventually, Montalbano refused the loan to the undercover detective for lack of collateral, and an eavesdropping warrant issued for Montalbano’s telephone.
The defendant Tomao was intercepted on numerous occasions in conversation with Montalbano pursuant to the March, 1982 warrant and extensions. These interceptions revealed that Montalbano often spoke with Tomao over a private telephone in the Key Food store where Tomao was employed as a manager. Conversations of Montalbano with Tomao and others revealed that Tomao was a large scale borrower from loan sharks and that Montalbano often acted as intermediary to obtain loans for Tomao and to protect Tomao from lenders to whom he was in arrears. It became apparent that Tomao was indebted to Vito Guzzo and Vincent Ricciardo, and was having difficulty meeting his weekly interest payments. Guzzo and Ricciardo complained to Montalbano that they were having to cover Tomao’s payments to their bosses. It also appeared that Nicholas Frustaci had instructed Tomao to delay his payments to Guzzo, and that, as a result, Guzzo, Ricciardo and Frustaci were being called to a meeting to resolve the terms of Tomao’s debts to the various lenders. As of late May, 1982 Tomao apparently owed $1,000 weekly interest to 10 separate lenders. By mid-June, the pressure on Guzzo to collect regularly from Tomao had increased to the point *402 where Guzzo was expected to deliver Tomao’s payments as soon as they were received. Montalbano, instructed Tomao to pay Guzzo and let the other lenders wait. A week later Tomao told Montalbano to put the word out that Tomao would be out of town for a week. Within two weeks, Montalbano died and the eavesdropping terminated.
In mid-September, 1982 the informant disclosed that Guzzo, Frustaci and others were going to meet in a pastry shop in Manhattan, where Montalbano had frequently contacted Frustaci. Under police surveillance, Guzzo, Frustaci and others met with Tomao and Tomao paid Guzzo $7,000 in cash. A pen register installed on the Key Food office telephone revealed that from mid-July to mid-September, 1982 Tomao called Guzzo 25 times; Ricciardo once; and numbers used by Montalbano to contact Frustaci, 10 times. It was also apparent, from the Montalbano conversations, that Ricciardo and Guzzo on occasion called Tomao at the Key Food number, and that Tomao had used the Key Food telephone to contact Guzzo and Frustaci, in addition to Montalbano. The pen register indicated that Tomao’s calls to the lenders continued through September 16, 1982.
Based upon the foregoing information, Justice Mollen issued the instant eavesdropping warrant which authorized the interception of communications “of Nicholas Frustaci, Vito Guzzo, Vincent Ricciardo, their accomplices, co-conspirators and agents, some of whom are as yet unknown, with Angelo Tomao as they occur over [the Key Food telephone] * * * relating to the crimes of Criminal Usury * * * and Conspiracy to commit these crimes.”
The court concludes, based upon the affidavits in support of the warrant, that the issuing Justice properly found probable cause to believe, as of September 21, 1982, that Guzzo and Frustaci were continuing to engage in usury and that Tomao continued to be indebted to them. Moreover, the pen register analysis in conjunction with the Montalbano tapes, provided ample reason to believe that Tomao’s calls to Guzzo and Frustaci from the Key Food telephone were in connection with his continued indebtedness to them. Given the Montalbano tapes, it was not necessary to determine the substance of the pen register calls to establish probable cause.
*403 The defendant’s prime contention is that probable cause was lacking to justify the Key Food warrant because, as far as the applicants were able to demonstrate to the issuing Justice, Tomao was a victim of usury and was not a usurious lender. Consequently, the defendant asserts, there was no reason to believe that the Key Food telephone was being used in connection with the commission of usury, within the meaning of the statute (CPL 700.15, subd 5). Stated in starkest terms, the defendant’s argument is that an eavesdropping warrant may properly issue only for a telephone from which or at which “a particularly described person is committing, has committed, or is about to commit a particular designated offense” (CPL 700.15, subd 2). The defendant concedes that the statute does not require probable cause to believe that the subscriber of the target telephone is engaged in the designated offense, and indeed the statute has been so construed explicitly by at least one Federal circuit court (United States v Sutton, 605 F2d 260, 273, n 18), and implicitly by the Supreme Court in Scott v United States (436 US 128) where the court upheld an eavesdropping warrant allegedly executed without regard to minimization requirements, despite the interception of conversations of Geneva Jenkins who “was mentioned in the affidavit only as the subscriber to [the] telephone” (United States v Scott, 331 F Supp 233, 247) and was not named as a target of interception.
The defendant would distinguish the foregoing cases on the ground that even though the subscribers were not targets of eavesdropping, the target telephone was the point of origin of the criminal activities of those who were named targets. There is an insufficient governmental interest, according to the defendant, to justify eavesdropping over the telephone of a person against whom criminal activity is directed. The court, however, finds no such limitation in the language or history of the statute or in applicable constitutional standards. Once it has been shown that there is probable cause to believe a particularly described person is committing a designated offense, and that evidence of such offense may be obtained through eavesdropping but is not otherwise practicably obtainable, all that remains to be shown, for the issuance of a valid *404 warrant, is probable cause to believe the target facilities “are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by” the suspect (CPL 700.15, subd 5; emphasis added).
The statute, phrased in the disjunctive, plainly encompasses instances in which the target telephone is “used in connection with the commission of” the designated offense, even though the telephone is not subscribed to or even “commonly used by” the target of interception. This provision would apply to the use of public telephones, or telephones belonging to others, to commit crimes. However, legislative history and judicial interpretation indicate that the provision has a broader meaning, encompassing the seizure of conversations over either the primary transmitting facility or over a secondary receiving facility. A valid eavesdropping warrant of necessity permits the interception of both parties to an incriminating conversation, since the conversation itself is the incriminating evidence; the “thing” to be seized (People v Gnozzo, 31 NY2d 134, 145; see, also, United States v Donovan, 429 US 413, 424-425).
The commentary in the Senate report on the Federal eavesdropping statute, in reference to the required showing of probable cause to believe that particular communications concerning the designated offense will be obtained through eavesdropping (US Code, tit 18, § 2518, subd [3], par [b]; CPL 700.15, subd 3), refers to the Supreme Court’s then recent opinion in Warden v Hayden (387 US 294). (US Code, Cong & Admin News, 1968, vol 2, p 2191.) This reference signifies the statute’s reliance upon the principle established in Hayden (supra, pp 306, 307) that the government may execute a warrant for the seizure of items “simply for the purpose of proving crime” as long as there is “a nexus * * * between the item to be seized and criminal behavior” (emphasis added). Hayden represented a significant departure from previous Fourth Amendment doctrine, which theretofore had limited search warrants to the discovery and seizure of contraband or the fruits and instrumentalities of a crime. The court declared in Hayden {supra, pp 306-307) that in searches for “ ‘mere evidence,’ probable cause must be examined in terms of cause to *405 believe that the evidence sought will aid in a particular apprehension or conviction.” Following Hayden, the validity of a search warrant depends upon the incriminatory nature of the thing seized, without regard to the specific manner in which it is connected with the criminal conduct or with the criminal suspect.
In the context of eavesdropping, the authority to seize conversations as “mere evidence” necessarily implies the corollary authority to seize such conversations wherever they may be found, regardless of a demonstrable nexus between the criminal suspect and the specific target telephone. A contrary view, in the context of eavesdropping would amount to resurrection of the pre-Hayden limitation upon the warrant clause, that only instrumentalities of a crime may be seized. Obviously, the seizure authorized by an eavesdropping warrant is not of the telephone, as an object, but of the conversations transmitted to and from that instrument. However, the defendant here does not object, in principle, to the seizure of the conversations, but to the absence of any connection between the device over which they were intercepted and the criminal suspects. To that extent, the defendant’s position is that the seizure must occur only over the device used by the suspect, which is, in effect, the “instrumentality of the crime” requirement in another form.
Another aspect of the defendant’s position is the alleged lack of justification for the invasion of his personal privacy in the absence of any demonstrable criminal wrongdoing on his part. However, as previously noted, a valid eavesdropping warrant authorizes the seizure of both parties to a pertinent conversation. Therefore, there is no greater invasion of his privacy in regard to his conversations with targets, whether the conversation is intercepted over his or the target’s telephone. Insofar as the warrant authorized the monitoring of defendant’s conversations to determine whether he spoke with a target of the investigation, there was a greater intrusion upon the defendant’s privacy than there would have been had the warrant been directed at the telephones of the targets themselves. In the latter case, the defendant would have been intercepted only when he spoke with a target. The use of the defendant’s telephone, *406 however, permitted the initial monitoring of his conversations, which would not otherwise have been accessible to the authorities, to determine their relevance to the investigation. This kind of intrusion, involving as it does the search for evidence of crimes under circumstances which impinge on the privacy concerns of nonsuspects, seems no different in constitutional terms from the intrusion in Zurcher v Stanford Daily (436 US 547), where the Supreme Court upheld the execution of a search warrant for “mere evidence”, in the form of photographs of a crime, from the offices of a college newspaper (see supra, pp 577-583, dissent of Stevens, J.). The Zurcher court (p 556), noting that a search warrant (or eavesdropping warrant) need not even name the person from whom the incriminating item is to be seized (United States v Kahn, 415 US 143, 155, n 15), held that “[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime, but that there is reasonable cause to believe that the specific ‘things’ to be searched for and seized are located on the property to which entry is sought.”
The purport of the statutory requirement of probable cause that the target facilities are being “used in connection with the commission of such [designated] offense” (CPL 700.15, subd 5) is, in the court’s view, the particular application in context of the specific place where the incriminatory conversations are sought, of the general requirement of probable cause that eavesdropping will disclose “particular communications concerning” the offense. (CPL 700.15, subd 3.) Both provisions are designed to ensure that eavesdropping will not be employed except to obtain evidence of specific crimes, and not simply to develop leads for obtaining evidence by other means.
The court finds that these constitutional and statutory criteria have been met in this case. The application for the warrant established that named targets of interception used the telephone to conduct their usurious lending activities, and that the defendant made and received telephone calls with the targets regarding his indebtedness, access to other lenders, and the terms of such loans. There was, therefore, probable cause to believe that evidence of usury, in the form of conversations between the targets and the *407 defendant, would be obtained by eavesdropping over the defendant’s telephone. The court notes, as a practical observation, that most victims of crime may be expected to be forthcoming in co-operation with law enforcement efforts to obtain evidence of their victimization. However, as the Supreme Court has noted, the Fourth Amendment does not compel the police to seek the voluntary co-operation of nonsuspects, at least where, as here, to do so would jeopardize the investigation (436 US, at p 561).
MINIMIZATION
The warrant authorized interception of communications not only of the named targets (Frustaci, Guzzo, Ricciardo), but also of “their accomplices, coconspirators and agents, some of whom are as yet unknown, with Angelo Tomao * * * relating to the crimes of usury * * * and conspiracy.” Within approximately a week of executing the September 21 warrant, the monitors intercepted one Leonard Di-Maria, a known loan shark, discussing Tomao’s indebtedness to him. DiMaria had not been identified previously in the investigation. It also appeared from interception of Tomao’s conversations and from physical surveillance that Tomao was indebted to Anthony Federici, who had been a supplier of loan funds to Montalbano. Thus, eavesdropping continued to reveal the participation in the usury conspiracy of others previously unknown. The warrant was amended on October 20 to include DiMaria as a target in regard to his conversations with Tomao pertaining to usury. The initial period of interception also disclosed that Frustaci had begun to Conduct other usurious activities from the Key Food telephone, and the warrant was amended on October 27 to authorize interception of Frustaci’s conversations with his accomplices, including borrowers other than Tomao, over the Key Food telephone.
During the first extension period, the executing officers monitored conversations between Tomao and outside parties who were not named as targets in the warrant. Specifically, on October 27, the officers monitored an incoming call from one Albert Socko to Tomao. The conversation was spot monitored. Initially, Socko explained that he had a promise for money from an unidentified woman, but that he needed a “fast two * * * three thousand dollars”. Tomao *408 observed “you need another two thousand from me tomorrow,” and shortly thereafter, “November’s coming up, what are we gonna do with that $25,000 note?” The officer discontinued interception. When the conversation again was monitored, Tomao stated, “another guy we give a few more dollars, little by little, we let him wait.” After a period of seconds, the officer again discontinued. A third spot monitor disclosed Tomao declaring that “these payments have got to be done * * * You told me you would give me a hard way worth $3,000 * * * Just give me my money back * * * I don’t want the interest no more * * * Get me my $80,000 * * * Otherwise we’re gonna have a problem.”
Again, on November 1, the officers monitored two conversations between Tomao and one Jay. During the initial interception, Jay was heard to complain about his financial problems and his need for $4,000 immediately. Interception was discontinued. When the conversation was again monitored, Tomao asked “[h]ow do I * * * get my * * * money out of there * * * I’m not gonna lose * * * the ten thousand dollars * * * not my money * * * I’m not gonna * * * pay out of my pocket. I’ll just have to come down there and take everything out of there”. The second conversation concerned Tomao’s demand that Jay “have a solution” by the next day, otherwise “some people are gonna give you a solution. That’s what they told me”.
At this point, the named targets were Frustaci, Guzzo and DiMaria, and the warrant authorized interception of their conversations with Tomao concerning usury. The defendant argues that since neither he nor Socko nor Jay were named targets, there was no lawful authority to intercept the foregoing conversations.
The crime of usury under investigation here involved an increasing number of participants, not all of whom were identified. Our Court of Appeals has held that, in such a context, “[c]onversations of persons who are not targets of the investigation may be monitored for brief intervals to assure that their use of the phone is not a ruse to mask a suspect’s use of the phone or to convey information regarding the crimes being investigated” (People v Floyd, 41 NY2d 245, 252; emphasis added). Therefore, it is permissible for the executing officers to monitor a conversation which does *409 not involve suspects to determine the possible pertinence of the conversation to the designated offense. (See United States v Kahn, 415 US 143, 156-157, supra.) The touchstone of the particularity requirement in such instances is a demonstrable nexus between the conversation ultimately seized and the specified crimes. The Fourth Amendment is implemented by limiting interception to patently incriminating conversations, under the supervision of a magistrate. (CPL 700.30, subd 7; United States v Kahn, supra, pp 154-155.) Where, as here, there was reason to believe that one who was not a suspect, i.e., Tomao, would nonetheless be the recipient of incriminatory communications from the known targets and their unknown accomplices, it was not improper to monitor Tomao’s conversations with unknown outside parties, for such a period as was required to determine whether the conversation was pertinent to the designated crimes. (See United States v Kahn, supra, pp 156-157; Scott v United States, supra, p 142.) Moreover, where the monitored conversation “could have been interpreted as having some bearing on the conspiracy” under investigation, its seizure will not be deemed in violation of minimization requirements, even though neither conversant was a target of interception. (Scott v United States, supra, p 142.)
Here, it was apparent from the outset that the outside conversants were discussing financial difficulties and loans related to such difficulties, with Tomao. Nonetheless, the conversations were not monitored in full, but were intercepted at brief intervals to determine their relevance to the crimes under investigation. Interception was continuous only when a connection appeared between Tomao and the loans under discussion. The fact that Tomao developed, in the context of these calls, as an apparent lender or at least broker of loan funds, did not render the conversations irrelevant to the crime under investigation. Nor was Tomao’s previous status as an apparent victim grounds for disregarding the evidently incriminating nature of these calls. Once the police were lawfully present on the wire, they were justified in seizing any obviously incriminating conversation. (People v Di Stefano, 38 NY2d 640, 648-649; see Coolidge v New Hampshire, 403 US 443, 466.)
*410 Accordingly, the defendant’s motion to controvert the eavesdropping warrant and to suppress evidence derived from the warrant is denied.