**UNITED STATES of America**

v.

**Edward B. ALLEN.**

**Crim. No. 74–243–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Jan. 22, 1975.

Joseph A. Fisher, III, Asst. U. S. Atty., Alexandria, Va., for plaintiff.

L. Shields Parsons, Norfolk, Va., for defendant.

## OPINION AND ORDER

KELLAM, Chief Judge.

Following his appearance before a Grand Jury, Edward B. Allen was indicted on two charges of perjury in violation of 18 U.S.C. § 1623. The basis of such charges was the alleged false testimony before said Grand Jury. He waived trial by jury, the United States agreed, and hence the whole issue of law and fact was submitted to the Court.

### I

The Grand Jury was investigating alleged violations of law by surveyors and inspectors employed by the United States Navy and various shipyards. Prior and subsequent to the date when it is alleged the false testimony was given, numerous surveyors for the Navy were indicted upon several charges. A considerable number entered pleas of guilty. Indictments were also returned against a number of shipyard officials.

In an effort to obtain evidence and the cooperation of certain surveyors, the United States Attorney stated to some of them that if they would fully cooperate, furnish information and testify, he would not request an indictment against them. Some of the surveyors agreed.

In the course of the investigation officials from various shipyards were re-

quested to appear before the Grand Jury to testify and to bring certain specified records. Such a summons was sent to the President of R. R. Allen & Company. Following receipt of that summons, after some conversation with the United States Attorney's office, Edward B. Allen, the Vice President of R. R. Allen & Company appeared and produced certain of the requested records. He was sworn and testified as a witness. He was questioned concerning alleged gifts to Naval surveyors. As a result of his responses, he was indicted on two counts for alleged violation of 18 U.S.C. § 1623.

Prior, during and subsequent to the presentation of the evidence, numerous questions and issues were raised by the defendant. Motions to dismiss the indictment as defective or insufficient, for discovery and other motions filed prior to date of trial have been dealt with and need not be here reviewed.

## II

At the trial the United States presented the evidence of several Naval surveyors, who testified that they had received whiskey, food, tires, lunches, travel, services of laborers, money and other items of value. In general, several surveyors testified that on evenings and at other times, the surveyors gathered at the place of business of R. R. Allen & Company for food and whiskey; that it was a regular meeting place for them. Specifically, surveyor Cherry testified that during 1969–70 he received a loan of $1,000.00 and was told later to "forget it;" that he received $500.00 in cash to buy a stereo and two tires for his automobile, all of which he arranged with defendant. Surveyor White, sometime about 1968, received bottles of whiskey, a sport coat, shirt and pair of slacks from defendant. Surveyor Walker testified he received whiskey, and that defendant gave him whiskey to carry to Surveyor Johnson and contracting officer Carmel; that defendant sent 100 pounds of beef by him to Carmel; that the witness received from defendant a set of new tires for his automobile; that

defendant paid his expenses for a trip to Pennsylvania and for him and his family at Nags Head; that at direction of defendant, he increased the cost of certain government work for which he received $1,000.00, and on another job he got $400.00; that he received a sport coat at the time White received clothing; all of which he said occurred prior to 1972.

## III

At the conclusion of the government's evidence and again at the conclusion of all of the evidence, defendant moved for a verdict of acquittal. The motion was granted as to Count I, but ruling on the motions as to Count II was reserved.

Defendant raises several issues which will be dealt with separately. He (a) challenged the indictment, asserting the oath administered at the Grand Jury hearing was not proper; (b) that the answers to the questions which are the basis of this indictment were not material; (c) that persons referred to as "surveyors" did not include "supervisors of surveyors" etc.; (d) that the evidence does not show defendant made the gifts in question, but that they were given by his company; (e) that the answers were not false.

### (a)

██ The Clerk's minutes show that on the day defendant offered the testimony which is the subject of the indictment, the deputy foreman was not present. The Court designated Mrs. Dixon as "assistant deputy foreman." Defendant says there is no provision in the statute, rules, or in the law for designating an "assistant" deputy foreman, and that since the rules authorize an oath to be administered by the foreman, and in his absence by the deputy foreman, that an oath administered by the "assistant" deputy foreman is not legal.

A transcript of the testimony and proceedings before the Grand Jury, prepared by the Court Reporter, is Government's Exhibit 1. It shows that Allen was duly sworn. In fact, she testified

that the foreman administered the oath.[1] She said it was her constant practice to be sure a witness was sworn before testifying. On cross-examination the Reporter said she could not say positively that the foreman rather than the "assistant" foreman did the swearing of the witness. Defendant's Exhibit 1 shows the witness was sworn, and the Reporter testified the witness was. In fact, the Reporter says the foreman swore the witness. There is no evidence to the contrary. Though the Reporter's testimony may have been weakened by cross-examination, since there is no evidence to the contrary, it is sufficient evidence. *See Brown & Root Marine, etc. v. Zapata Off-Shore Co.,* 377 F.2d 724, 726 (5th Cir. 1967).

█ But, there are other reasons why the motion should be denied. The fact that the Court may have designated Mrs. Dixon as an "assistant" deputy foreman did not mean she was not a deputy foreman. The use of the word "assistant" is merely surplusage and of no importance. The designation is really of a deputy foreman. Too, a perjury prosecution may be predicated on false testimony made under an oath administered by a de facto officer. And generally it is considered immaterial whether the person administering the oath is an officer de jure or de facto, if his act takes place in the presence of the Court or one authorized to administer the oath, and with its apparent sanction. 60 Am. Jur.2d page 970, subject Perjury ¶ 7.

### (b)

█ A copy of the indictment and the full testimony of the defendant before the Grand Jury are appended to this opinion so that easy reference thereto may be had. The issue of whether the questions and answers were material to the matter before the Grand Jury is one for the Court. *United States v. Paolicelli,* 505 F.2d 971 (4th Cir. 1974).

█ The Grand Jury was investigating the activities and actions of Naval surveyors and shipyard officials in giving and receiving gifts, moneys and other items, in violation of Title 18 Chapter 11 of U.S.C., §§ 201 and subsequent sections. It had heard numerous witnesses concerning these issues. It had requested records of Allen's shipyard relating to purchase of items alleged to have been given to surveyors to influence their actions. It was under these circumstances defendant appeared and produced records. Whether defendant and others had made gifts to surveyors was an issue under investigation.

█ A reasonable test is not whether the answers or statements made did influence the tribunal on the issue before it, but whether it could have influenced it, or whether it had a reasonable and natural tendency to do so. A statement is usually sufficient to support a charge of perjury if it is material to any proper matter of inquiry, or if it is intended or calculated to bolster the testimony of a witness on some material point, or support or attack the credibility of a witness. Broadly speaking, any testimony that is relevant in the trial of a case, whether to the main issue or a collateral issue is sufficiently material to render one guilty of perjury who knowingly and wilfully falsifies in giving it. *United States v. Tyrone,* 451 F.2d 16 (9th Cir. 1971), cert. denied, 405 U.S. 1075, 92 S.Ct. 1494, 31 L.Ed.2d 808; *United States v. Lococo,* 450 F.2d 1196 (9th Cir. 1971), cert. denied, 406 U.S. 945, 92 S.Ct. 2040, 32 L.Ed.2d 331; *United States v. Gremillion,* 464 F.2d 901 (5th Cir. 1972), cert. denied, 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672; *United States v. Carson,* 464 F.2d 424 (2d Cir. 1972), cert. denied, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219; *United States v. Winter,* 348 F.2d 204 (2d Cir. 1965), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360; Vol. 60 Am.Jur. page 973 ¶ 11, subject Perjury.

---

1. The foreman was present at the time. Evidence was presented that the foreman, a Certified Public Accountant, took no part in the discussions or proceedings concerning the activities of the shipyards because he had done some accounting work for some of them.

In *United States v. Collins,* 272 F.2d 650, 653 (2d Cir. 1959), the Court dealt with the issue of alleged false testimony before a Grand Jury, and quoted with approval the following from *Carroll v. United States,* 16 F.2d 951, 953 (2d Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880:

> "Its (the grand jury's) investigation and full duty is not performed unless and until every clue has been run down and all witnesses searched for and examined in every proper way to find if a crime has been committed, and to charge the proper person with the commission thereof. Its investigation proceeds step by step. A false statement by a witness in any of the steps, though not relevant in an essential sense to the ultimate issues pending before the grand jury, may be material, in that it tends to influence or impede the course of the investigation. This materiality has been recognized by the courts. (Citing cases.) The test of materiality in a grand jury's investigation, and, if it does, an indictment for perjury may be predicated upon it."

*See also United States v. Kahan,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Stone,* 429 F.2d 138, 140 (2d Cir. 1970); *United States v. Paolicelli,* 505 F.2d 971 (4th Cir. 1974).

### (c)

■ At the trial defendant objected to any testimony from a supervisor of surveyors, a Naval surveyor or any person who was not classified as a surveyor.

The evidence clearly established that in the industry and among all those familiar with the trade, the term surveyor included Naval surveyor, inspector, Naval inspector, ship's surveyor, supervisors of Naval surveyors, supervisor of surveyors. In fact, defendant presented an expert witness who testified substantially to the same facts, and who said that these terms were generally known in the industry, and when a person made any such reference, it was known what they referred to.

There is no suggestion that the defendant did not know what the question related to, or that the question was misunderstood. But even if it referred singularly to a surveyor and did not include supervisor, there is sufficient evidence relating to surveyors to justify the verdict.

### (d)

In dealing with the questions and answers which are the subject of Count II of the indictment, the issue is raised as to whether the answers to the questions propounded constituted a violation of 18 U.S.C. § 1623. That is, did defendant "knowingly make any false material declaration." It is suggested that defendant was Vice President of R. R. Allen & Company, and that the questions propounded did not ask whether R. R. Allen & Company had made gifts or done other acts, but they related to the actions of defendant, that is, whether he had made gifts. There are two answers to this. First, a company acts only through its officers and agents, and it is clear from the record that defendant knew what the question referred to. Secondly, it is perfectly clear from the record that defendant did not answer truthfully, for he had given whiskey and other gifts to surveyors, and knew that gifts had been given to them. We do not have the situation which existed in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568. Here it is clear the defendant and the United States Attorney knew what the questions referred to, what information was sought, the purpose of the information and what the true facts were. Defendant was not in the slightest confused by the questions, and the minds of defendant and the United States Attorney "did, in fact, meet on the definition of the words being used in the interrogation," and in this context defendant's answers were false and knowingly false. *United States v. Paolicelli, supra. See also United States v. Kahan, supra.*

### (e)

The contention that the answers were not false is clearly without merit. What

has heretofore been said relates to this issue. Defendant in fact did give gifts to the surveyors. While he was an officer of the company, he is the one who made the gifts. He was the one present, who gave the instructions relating to gifts, who directed the purchase of the gifts, who directed the surveyors where and when to receive the gifts, who selected the gifts, who directed items to be charged to him. There is no evidence that the company made the gifts or paid for them, or that they were ever shown in the company's record.

### IV

The evidence is sufficient to and does establish the guilt of the defendant beyond a reasonable doubt.

The motion for a verdict of acquittal made at the conclusion of the government's evidence and at the end of presentation of all of the evidence, is denied.

Counsel should contact this office within five days to fix a date for disposition.

If a pre-sentence report is desired and has not heretofore been requested, defendant should immediately report to the probation officer.

### APPENDIX

THE GRAND JURY CHARGES:

1. That on or about September 13, 1973, in the Eastern District of Virginia, Edward B. Allen, while under oath as a witness before a Grand Jury of the United States District Court for the Eastern District of Virginia, in a matter entitled "*United States v. John Doe*," knowingly did make a false declaration, that is to say:

2. At the time and place aforesaid, the Grand Jury was inquiring into matters involving the receipt of gifts and gratuities by employees of the United States Navy from contractors in the business of repairing Navy ships.

3. It was a material matter to said inquisition to determine if any such employees had received gifts and gratuities from Edward B. Allen.

4. At the time and place aforesaid, Edward B. Allen, while under oath, did knowingly declare before said Grand Jury with respect to the aforesaid material matter as follows:

Q Now, Mr. Allen, I am going to ask you a very broad general question that I have asked the other gentlemen that have been in here today.

Do you have any knowledge of gifts, gratuities, free services or whatever you want to call it, being given to naval surveyors?

A None that I can recall.

Q In other words, you don't have any personal knowledge of that?

A No, sir.

5. The aforesaid testimony of Edward B. Allen, as he then and there well knew and believed, was not true in that Edward B. Allen had given gifts and gratuities to individuals whom he knew and understood to be naval surveyors including the naval surveyor Art Walker. (Violation of Title 18, United States Code, Section 1623)

### COUNT II

THE GRAND JURY FURTHER CHARGES:

1. That on or about September 13, 1973, in the Eastern District of Virginia, Edward B. Allen, while under oath as a witness before a Grand Jury of the United States District Court for the Eastern District of Virginia, in a matter entitled "*United States v. John Doe*," knowingly did make a false declaration, that is to say:

2. At the time and place aforesaid, the Grand Jury was inquiring into matters involving the receipt of gifts and gratuities by employees of the United States Navy from contractors in the business of repairing Navy ships.

3. It was a material matter to said inquisition to determine if any such employees had received gifts and gratuities from Edward B. Allen.

4. At the time and place aforesaid, Edward B. Allen, while under oath, did knowingly declare before said Grand

Jury with respect to the aforesaid material matter as follows:

Q Let me ask you this question, and I'll repeat again: Have you ever given anything to Art Walker?

A Have I ever given him anything. Do you mean—

Q Have you ever paid for gasoline for him, given him bottles of booze, given him anything free?

A No, sir.

Q What about any other naval surveyors?

When I say "given," I mean given anything yourself or caused it to be given by people working for you.

MR. FISHER: As a result of your business dealings that you might have had with them.

BY MR. DUNHAM:

Q I'm not talking about Christmas gifts or anything like that.

A None that I can recall, sir.

Q And in your business with the naval ship repair, you do not know of yourself, or any people working for you, giving things to naval surveyors?

A No, sir.

* * * * * *

Q And absolutely positive you haven't given any naval surveyor anything?

A That I recall, yes, sir.

5. The aforesaid testimony of Edward B. Allen, as he then and there well knew and believed, was not true in that Edward B. Allen had given gifts and gratuities to individuals whom he knew and understood to be naval surveyors including the naval surveyor Art Walker. (Violation of Title 18, United States Code, Section 1623)

A TRUE BILL:

_____
F O R E M A N

BRIAN P. GETTINGS
United States Attorney

By: _____
Frank W. Dunham, Jr.
Assistant United States Attorney

EDWARD B. ALLEN, having been first duly sworn, was examined and testified as follows:

BY MR. DUNHAM:

Q Would you state your name, please?

A Edward B. Allen.

Q And where do you work?

A R. R. Allen.

Q Are you the President of the firm, of R. R. Allen, Incorporated?

A No, I'm Vice President.

Q You are Vice President?

A Yes, sir.

Q Who are the owners of that firm?

A The principal owner is R. R. Allen.

Q And who is that?

A My father.

Q And what portion does he own?

A About 85 percent.

Q Now, is that a ship repair firm?

A Yes, sir.

Q Now, have you searched your records for all records including the accounting data and receipts and invoices reflecting the purchase of alcoholic beverages by R. R. Allen, Incorporated in the calendar years of 1967 through 1971?

A It's not finished, sir.

Q Have you got some of them?

A Not on alcoholic beverages, no, sir.

Q When can you turn them over to the agents of the FBI?

A As soon as I can get up with them.

Q Do you think it will be within the next couple of weeks, that you can get them together within the next couple of weeks?

A Yes, sir.

Q Thank you very much.

The next item, all records, correspondence, memorandum, purchase orders and invoices and proof of payments reflecting purchase of automobile tires by R. R. Allen in the calendar years of 1967 through 1971. Have you got those with you?

A    I have most of the purchase orders.

Q    You have most of them?

A    Yes, sir.

Q    Are you still looking?

A    Yes, sir.

Q    Why don't you give us the ones that you have and the agents, when you contact them about that, will pick up whatever else you've got.

Now, how do you know what job or what account these items are charged to? Do you have an accounting code on here?

A    Yes, sir.

Q    Does "E" mean something?

A    No. Where it says requisition number does.

Q    That means somebody in your company wrote a requisition for the tires?

A    Right.

Q    You didn't bring the requisitions though?

A    No, sir. I have to get these first.

Q    Then get the requisitions?

A    Yes, sir.

Q    If we gave you a list of requisition numbers, you would dig them out for these?

A    Yes, sir, just give me the purchase order number that you got it from.

Q    Very good.

Now, all records and purchases by R. R. Allen, Incorporated on Exxon credit cards for the calendar years 1967 through 1971.

A    We didn't have Exxon.

Q    You didn't have Esso?

A    No, sir.

Q    You didn't have credit cards?

A    Yes, sir.

Q    What credit cards?

A    The best records that I have that I can find is for Texaco and Gulf.

Q    Did you have charge accounts or expense accounts at Esso stations even though you had no credit cards?

A    No, sir.

Q    All records of payment by R. R. Allen, Incorporated to the Bid-a-wee Golf Course for the calendar years of 1967 through 1971.

A    We have none.

Q    You have nothing, absolutely no records of Bid-a-wee?

A    No, sir.

Q    And all purchase orders and invoices, proof of payments, accounting data and records reflecting purchases at the Hub in Chesapeake for the calendar years 1967 through 1971.

A    We do not have any.

Q    You do not have any?

A    No, sir.

Q    So you have no records of any purchases there?

A    No, sir.

Q    And the contract file for repairs on the YTM–161, Job 129–367. Have you got that?

A    Yes, sir.

Q    Now, those files include what; your specifications?

A    The account file, the job file, the specifications, everything pertaining to the job.

Q    Now, Mr. Allen, I am going to ask you a very broad general question that I have asked the other gentlemen that have been in here today.

Do you have any knowledge of gifts, gratuities, free services or whatever you want to call it, being given to naval surveyors?

A    None that I can recall.

Q    In other words, you don't have any personal knowledge of that?

A    No, sir.

Q    Do you know a man by the name of Art Walker?

A    Yes, sir.

Q    Has he ever been related with you in business?

A    Yes, sir.

Q    Was this a talent type of operation? In other words, were you in the business of furnishing girls, for instance, for Mr. Walker?

A   R. R. Allen, Incorporated?

Q   I am talking about you personally with Mr. Art Walker.

A   Rephrase the question, or re-ask it.

Q   Have you been in business with Art Walker, or any business venture with Art Walker?

A   I don't know whether he came into the business or not.   He was asked to, but I can't recall whether he did or not.

Q   Who asked him to?

A   There was a group of us.

Q   Who all was in the group?

A   A Charles Wiggs; a man by the name of Tom Anthony; a man by the name of Ben Basnight, and myself.

Q   Now, Mr. Allen, do you have an attorney representing you, by the way?

A   No, sir.

Q   No attorney?

A   No, sir.

Q   Have you consulted one?

A   No, sir.

Q   Do you know you have a right to have an attorney here today?   I hope you understand that from our phone call. You have a right to have one.

A   I didn't know I needed one.

Q   I don't know whether you need one or not, but I am telling you have a right to have one if you want one.   Do you understand that?

A   Yes, sir.

Q   Are you able to retain counsel if you want one?

A   No, sir.

Q   In other words, if you needed to retain a lawyer, you do not have money to do it?

A   No.

Q   You are indigent?

A   Yes, sir.

Q   Would you like the Court to appoint counsel for you?

A   Do you feel I need one?

Q   Well, I don't know.   I really don't know.   I'm asking you this question, if you feel like you need an attorney.

A   I don't feel I need one, no, sir.

Q   But if you want one, do you understand that the Court will have one appointed for you and will pay him for you if you cannot afford it?

A   Yes, sir.

Q   Now, I want to explain to you that you don't have to answer any questions that may tend to incriminate you personally.

MR. FISHER:  Not suggesting that, you know, you are the focus of a criminal indictment.

THE WITNESS:  Yes, sir, that's what I understand.

MR. FISHER:  We want you to understand that.   You might or might not be.   I mean, we don't know, but Mr. Dunham wanted you to understand that.

BY MR. DUNHAM:

Q   I want you to understand that you have a right to refuse to answer any question that might tend to incriminate you personally.

A   Yes, sir.

Q   Any time you feel you don't want to answer the question you may invoke the 5th Amendment right.   And any time you feel you need the advice of an attorney and can't afford one, you tell me and we will see that one is appointed for you.   Do you understand that?

A   Yes, sir.

Q   Let me ask you this question, and I'll repeat again:  Have you ever given anything to Art Walker?

A   Have I ever given him anything. Do you mean—

Q   Have you ever paid for gasoline for him, given him bottles of booze, given him anything free?

A   No, sir.

Q   What about any other naval surveyors?

When I say "given," I mean given anything yourself or caused it to be given by people working for you.

MR. FISHER:  As a result of your business dealings that you might have had with them.

BY MR. DUNHAM:

Q I'm not talking about Christmas gifts or anything like that.

A None that I can recall, sir.

Q And in your business with the naval ship repair, you do not know of yourself, or any people *working for you*, giving things to naval surveyors?

A No, sir.

Q What about the services of prostitutes? Have you given the services of prostitutes to naval surveyors?

A No, sir.

Q Are you absolutely sure?

A Absolutely positive.

Q And absolutely positive you haven't given any naval surveyor anything?

A That I recall, yes, sir.

Q That you can recall.

This includes liquor, gasoline, tires, just general comshaw items?

A Yes.

Q You know what I mean when I say cumshaw, do you not?

A Yes, sir.

MR. DUNHAM: Does any member of the Grand Jury have any questions? Okay. No further questions, Mr. Allen. You are excused.

(Witness excused.)