08-3785-cr
United States v. Concepcion

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2008

(Argued: June 3, 2009;                    Decided: August 31, 2009)

Docket No. 08-3785-cr

------------------------------------------------------------X

United States of America,

Appellant,

- v. -

Alexander Concepcion, also known as Alex Concepcion

Defendant-Appellee.

------------------------------------------------------------X

Before:   McLAUGHLIN, CALABRESI, and SACK, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York (Scheindlin, J.) suppressing evidence obtained pursuant to a wiretap authorized under 18 U.S.C. § 2518.  We hold that the Government's affidavit in support of its application for the wiretap set forth facts "minimally adequate" to support the finding that a wiretap was necessary to the Government's investigation.

REVERSED AND REMANDED.

<div style="margin-left:40%">

WILLIAM J. HARRINGTON, Assistant United States Attorney, **for** Lev L. Dassin, Acting United States Attorney for the Southern District of New York (John T. Zach, Jonathan S. Kolodner, on the brief), for Appellant.

</div>

DARRELL B. FIELDS, Federal Defenders of New York, for Defendant-Appellee.

McLAUGHLIN, Circuit Judge:

The United States appeals an order by the United States District Court for the Southern District of New York (Scheindlin, J.) suppressing evidence obtained pursuant to a wiretap. The wiretap had been authorized under 18 U.S.C. § 2518 by a different district judge in the Southern District of New York (Marrero, J.). In holding that the evidence should be suppressed, Judge Scheindlin found insufficient the same representations that Judge Marrero had accepted: that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

The Government argues that its affidavit in support of its wiretap application established that a wiretap was necessary to its investigation. While the Government's affidavit was skimpy in details as to whether other investigative techniques were likely to succeed, we conclude, nonetheless, it did set forth facts "minimally adequate" to support Judge Marrero's initial determination. Accordingly, we reverse and remand.

**BACKGROUND**

In 2007, an incarcerated confidential informant ("CI") informed the Government that his former cellmate, Alexander Concepcion, planned to assist foreign terrorists in attacking the United States. Based on the CI's allegations, the FBI's Joint Terrorism Task Force applied to the District Court for authorization to wiretap Concepcion's cell phone under 18 U.S.C. § 2518. The Government was required to provide to the court "a full and complete statement as to whether or not other investigative procedures ha[d] been tried and failed or why they reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

The district court granted the application on June 20, 2007, with the wiretap to expire 30 days later. The FBI found no evidence of terrorism, but the wiretap did lead the FBI to believe that Concepcion was involved in drugs and weapons trafficking.

On July 20, 2007, the Government submitted a second application to the district court (Marrero, J.) that focused just on Concepcion's alleged drugs and weapons trafficking. Agent Eric Paholsky of the FBI's Gangs, Criminal Enterprises, and Drugs Group submitted an affidavit detailing how several investigative techniques either had failed or were likely to fail. Paholsky first explained that the Government could not use its original CI because he was in prison, and Concepcion, an experienced

trafficker, would be unlikely to deal with a prisoner under constant surveillance. The Affidavit also recounted how the FBI, in its efforts to investigate the terrorism allegations, had sought to introduce an undercover officer to Concepcion through the CI, but Concepcion would not engage with the officer. Based on that experience, Paholsky asserted that it would be impossible to introduce yet another agent to Concepcion with the aid of the CI. Because the Government was unable to identify other associates of Concepcion, the Government could not investigate his drug activities through the use of informants.

The Paholsky Affidavit next discussed the Government's "limited surveillance" of Concepcion, explaining that "because none of the TARGET SUBJECTS except for . . . CONCEPCION have been definitively identified, surveillance is of limited utility at this time." The Affidavit continued,

> [S]ince the June 20th Order was issued, agents have attempted to conduct physical surveillance of CONCEPCION on numerous occasions. They have seen CONCEPCION repeatedly change cars over this time period . . . [and] seen him drive in an erratic manner. These things have made surveillance difficult. In addition, based on my training, I know that narcotics and weapons traffickers are extremely surveillance conscious.

Finally, the Affidavit evaluated a variety of other traditional investigative techniques: telephone records and pen registries would be ineffective because they would not reveal the actual content of conversations or the identities of speakers; interviews or grand jury subpoenas would be ineffective given

4

that witnesses who could provide relevant evidence had not been identified; and search warrants were not appropriate because the locations where Concepcion and his cohorts stored documents, weapons, or narcotics had yet to be identified.

Based on these representations, Judge Marrero authorized the second wiretap application. In the following month, the Government used the wiretap to record conversations that, according to the Government, indicated Concepcion was indeed involved in a drug conspiracy.

In November 2007, Concepcion was arrested and charged in the Southern District of New York with 1 count of conspiracy to possess with intent to distribute over 50 grams of crack cocaine. The case was assigned to Judge Scheindlin. Concepcion moved to suppress the recordings of his conversations intercepted pursuant to the second wiretap authorization.

Concluding that the Government had failed to establish that other investigative techniques had failed or were likely to fail, Judge Scheindlin granted Concepcion's motion. In her decision, Judge Scheindlin discounted many of the Paholsky Affidavit's assertions, finding that "[t]he Government has shown that it has done little, other than the wiretap, in its investigation of Concepcion's drug-trafficking activities."

As to the Government's attempts to use its CI to introduce an undercover agent, the court noted that the Government made no attempt to introduce an undercover officer "for the purpose of

buying drugs from, or selling drugs to, Concepcion."

Judge Scheindlin also discounted the Paholsky Affidavit's discussion of surveillance, finding that based on her experience in "numerous drug cases," techniques such as photographing Concepcion with his cohorts and trying to match those photographs to FBI databases were "underutilized."

Judge Scheindlin thus concluded that "the Government simply bypassed other more conventional techniques in favor of an already existing wiretap," which was an "impermissible shortcut."

The Government now appeals.

**DISCUSSION**

We have jurisdiction to review a district judge's decision to suppress evidence, 18 U.S.C. § 3731, and we grant considerable deference to the district court's decision whether to allow a wiretap, ensuring only that "the facts set forth in the application were minimally adequate to support the determination that was made," United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (internal quotation marks omitted).

Here, this deference standard is complicated by the fact that the district judge deciding the motion to suppress (Judge Scheindlin) essentially reversed the district judge who initially authorized the wiretap (Judge Marrero), leaving us with the Solomonic question: to which district judge do we owe this deference? However, we need not decide this issue because the parties agreed during oral argument that the decision we must

make is whether Judge Marrero abused his discretion in approving the Government's application. Thus, we focus on whether the facts set forth by the Government were "minimally adequate" to support Judge Marrero's decision.[1]

We turn to the substantive requirements of a wiretap application. In Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 et seq., Congress struck a balance between "the needs of law enforcement officials [and] the privacy rights of the individual." See Miller, 116 F.3d at 663. While Title III allows for wiretaps in limited circumstances, law enforcement must apply for a court order before conducting such surveillance, 18 U.S.C. § 2518, and set forth "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," id. § 2518(1)(c). The district court must ensure that this standard has been met, id. § 2518(3)(c), so that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime,"

---

[1] We note that this concession finds support in our precedent. In United States v. Wagner, 989 F.2d 69 (2d Cir. 1993), we held, with respect to whether an affidavit for a wiretap had established probable cause, "The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." Id. at 72. We went on to reverse the district court's suppression of evidence because it had not accorded sufficient deference to the initial decision to authorize a wiretap, on which the Government had relied. Id. at 74.

*United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

We have acknowledged that "it would be in some sense more efficient to wiretap whenever a telephone was used to facilitate the commission of a crime. But the statutory requirement . . . reflects a congressional judgment that the cost of such efficiency in terms of privacy interests is too high." *United States v. Lilla*, 699 F.2d 99, 105 n.7 (2d Cir. 1983). In other words, the question is not whether a wiretap provides the simplest, most efficient means of conducting an investigation; telephonic surveillance may only be used when it is necessary to assist in law enforcement. With these concerns in mind, we have emphasized that "generalized and conclusory statements that other investigative procedures would prove unsuccessful" will not satisfy Title III. *Id.* at 104.

To be sure, the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance. "[T]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (alteration and internal quotation marks omitted). "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion." S. Rep. No. 90-

1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2190 (citation omitted).

Applying this commonsense approach, we have approved of wiretaps in complex and sprawling criminal cases involving large conspiracies, see, e.g., United States v. Torres, 901 F.2d 205, 232 (2d Cir. 1990) ("[T]he affidavits here convincingly established that the Torres Organization was a large scale operation which could not be adequately surveilled by traditional investigative methods."), as well as in cases with peculiar circumstances that made traditional investigative techniques difficult, see, e.g., United States v. Ruggiero, 726 F.2d 913, 924 (2d Cir. 1984), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997) (noting that the criminal enterprises under investigation "were in a homogenous neighborhood in Brooklyn where normal surveillance was risky").

Turning to the facts in this case, we begin by emphasizing the unusual origin of the investigation into Concepcion's drug activities. The CI provided no information about drug trafficking, and appears to have had no information to provide. Specifically, the Government could not obtain from the CI the names of any of Concepcion's drug co-conspirators, the details as to Concepcion's drug-trafficking methods, or the locations where the drugs were stored or exchanged. In sum, the CI provided a lead to one investigation of terrorism; that investigation, fruitless in its own right, led to an unrelated investigation of

9

drug trafficking. Having stumbled across the drug case, the Government had but two limited avenues of investigation other than the wiretap—continue to use the CI or attempt physical surveillance of Concepcion.[2]

Judge Scheindlin, who suppressed the wiretap evidence, believed that these leads could have been better leveraged before resorting to a wiretap. While an exceptionally close case, we disagree with her conclusion that the wiretap application was insufficient to support Judge Marrero's wiretap authorization.

With respect to the CI, the Paholsky Affidavit aptly demonstrated both how the Government had "tried and failed" to use the CI to infiltrate Concepcion's operation, and why further such attempts "reasonably appear[ed] to be unlikely to succeed." See 18 U.S.C. § 2518(1)(c). First, the Affidavit explained that the CI attempted to introduce an undercover agent to Concepcion, but Concepcion refused to engage with the agent. Second, further attempts to use the CI reasonably appeared unlikely to succeed because Concepcion would not work with the CI, who was still incarcerated. Further, we are not persuaded that it makes any difference that these initial attempts to use the CI were with respect to the terrorism investigation. Regardless of the timing or scope of those efforts, the Paholsky Affidavit established

---

[2] It is not disputed that the other techniques described in the Paholsky Affidavit—convening a grand jury, seeking search warrants, or using a pen registry-would have been either unhelpful or premature.

10

that the CI's usefulness had been exhausted.

Accordingly, the Government was left with only traditional surveillance as a means to investigate Concepcion. And it is with respect to this technique that the Paholsky Affidavit was less than thorough. This was not the type of large criminal drug conspiracy that often requires the aid of a wiretap. Cf. Torres, 901 F.2d at 232. Many of the Affidavit's statements concerning surveillance, such as the statement that "narcotics and weapons traffickers are extremely surveillance conscious," apply to all drug cases. See Lilla, 699 F.2d at 104 (finding the Government's affidavit insufficient because it failed to explain how "this narcotics case presented problems different from any other small-time narcotics case"). Additionally, instead of detailing the Government's specific attempts at surveillance, the Affidavit merely claimed that "agents . . . attempted to conduct physical surveillance of CONCEPCION on numerous occasions."

These general explanations leave a reviewing court to wonder how many times the Government attempted surveillance, at what time, where exactly, and why the Government could not "definitively identif[y]" any of Concepcion's associates. The Paholsky Affidavit seems to suggest that simply because other unknown individuals were involved in Concepcion's activities, a wiretap was necessary. But we have been clear that part of the reason law enforcement performs physical surveillance is to identify co-conspirators. See Lilla, 699 F.2d at 105 n.6 ("The

11

individuals involved in this conspiracy . . . would obviously remain 'unknown' until some sort of investigative efforts were attempted."). Once co-conspirators had been "definitively identified," the Government could have sought an informant or introduced a different undercover agent.

Still, while the Affidavit was not thorough in this respect, we think it was at least "minimally adequate to support" Judge Marrero's initial decision to grant the wiretap. See Miller, 116 F.3d at 663 (internal quotations marks omitted). The Affidavit was far more detailed than the representations made by law enforcement in Lilla, where the supporting affidavit indicated that traditional investigative techniques not only appeared likely to be effective, but were in fact effective, and thus we ordered the evidence suppressed. See Lilla, 699 F.2d at 100-01, 104. Unlike Lilla, the Government here set forth just enough facts to indicate that other techniques were not working, and because of the unusual origin of the case, it could not find new leads. Thus, the Government was faced with the decision either to continue the wiretap or forego its investigation of Concepcion.

We should add, however, that in coming to this conclusion, we do not endorse the effort put forth by the Government in its affidavit. A first read leaves the impression that the Government chose to reapply for the wiretap not because it was necessary, but because it was easier than beginning a new

12

investigation; since the wiretap was up and running and providing valuable information, better to let it run its course than to begin a new investigation into a low-level drug trafficker. District courts must remain vigilant in ensuring that this kind of reasoning, based more on efficiency and simplicity than necessity, will not justify a wiretap. For the Government to avoid future suppression orders, it would do well to spell out in more detail its investigative efforts. A wiretap is not a device to be turned to as an initial matter, but only where the circumstances demonstrate that it is necessary.

## CONCLUSION

For the foregoing reasons, we REVERSE the suppression order and REMAND to the district court for further proceedings consistent with this opinion.