[945 NE2d 447, 920 NYS2d 254]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v REGINALD RABB, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN MASON, Appellant.

Argued January 4, 2011; decided February 15, 2011

## POINTS OF COUNSEL

*Office of the Appellate Defender*, New York City (*Kerry S. Jamieson* and *Richard M. Greenberg* of counsel), for appellant in the first above-entitled action. Where the prosecution's eavesdropping warrant application for the "Divine" cell phone failed to make a particularized showing that normal investigative measures would be insufficient if employed against "Divine," the application was insufficient as a matter of law, and the intercepted communications and all other evidence obtained pursuant to the invalid warrant should have been suppressed and the indictments dismissed. (*People v Capolongo*, 85 NY2d 151; *United States v Carneiro*, 861 F2d 1171; *People v Fonville*, 247 AD2d 115; *Berger v New York*, 388 US 41; *United States v Giordano*, 416 US 505; *People v McGrath*, 46 NY2d 12; *People v Shapiro*, 50 NY2d 747; *United States v Gonzalez, Inc.*, 412 F3d 1102; *United States v Ippolito*, 774 F2d 1482; *United States v Lilla*, 699 F2d 99.)

*Center for Appellate Litigation*, New York City (*Barbara Zolot* and *Robert S. Dean* of counsel), for appellant in the second above-entitled action. The prosecution failed to satisfy CPL 700.15 (4)'s "necessity" requirement for obtaining an eavesdropping warrant, where its allegations that "normal investigative procedures" had been tried and had failed, or would not be likely to succeed if tried, were based on an investigation of different suspects and a different enterprise. (*Berger v New York*, 388 US 41; *Olmstead v United States*, 277 US 438; *People v Capolongo*, 85 NY2d 151; *People v Kramer*, 92 NY2d 529; *People v Gallina*, 66 NY2d 52; *People v Darling*, 95 NY2d 530; *People v Schulz*, 67 NY2d 144; *People v Sher*, 38 NY2d 600; *People v Winograd*, 68 NY2d 383; *People v Weaver*, 12 NY3d 433.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Susan Axelrod* and *Alan Gadlin* of counsel), for respondent in the first and second above-entitled actions. Detective Novellino's March 31, 2005 application for authorization to eavesdrop over Reginald Rabb's cell phone sufficiently established that alternative techniques either had been tried and failed or were not likely to succeed, if tried. (*Berger v New York*, 388 US 41; *People v Shapiro*, 50 NY2d 747; *People v McGrath*, 46 NY2d 12; *People v Teicher*, 52 NY2d 638; *People v Darling*, 95 NY2d 530; *People v*

v Capolongo, 85 NY2d 151; *People v Gallina,* 66 NY2d 52; *People v Schulz,* 67 NY2d 144; *People v Weaver,* 12 NY3d 433; *United States v Kahn,* 415 US 143.)

**OPINION OF THE COURT**

PIGOTT, J.

Defendants Reginald Rabb and Steven Mason—who ran P&D Construction Workers Coalition, a minority labor coalition[1]— challenge the People's March 31, 2005 eavesdropping warrant application on the ground that the People failed to establish that normal investigative measures had been exhausted, were reasonably unlikely to succeed if tried, or were too dangerous to employ (*see* CPL 700.15 [4]; 700.20 [2] [d]). Supreme Court denied defendants' motions to suppress and defendants pleaded guilty. The Appellate Division affirmed the judgments upon their guilty pleas, holding that the People's application adequately explained why normal investigative measures would be reasonably unlikely to succeed if tried (66 AD3d 487 [2009]). Because there is record support for that conclusion, we now affirm.

I.

In 2002, the Labor Racketeering Unit of the New York County District Attorney's Office (LRU) began investigating the activities of a minority labor coalition called Akbar's Community Services. Akbar was run by Derrick Walker and his associate Frederick Rasberry, who utilized the coalition to force construction companies, under the threat of vandalism or intimidation, to hire coalition workers and/or pay money for "security" from intimidation from other labor coalitions. During a three-year investigation into Akbar's practices, the LRU's investigatory techniques included, among other things, placing a senior LRU investigator undercover as a construction company owner whereby he paid Rasberry $800 a month for "security" from other coalitions and conducting numerous interviews with construction company personnel about Akbar's practices.

The Akbar investigation uncovered certain coercive techniques engaged in by P&D. During one interview with a construction company president in May 2004, an LRU investigator inquired as to whether he had been contacted by Walker or Rasberry. He responded that he had not, but that he had been

---

1. Such coalitions originated in the 1960s as a legitimate means of assisting minority workers to obtain work in the construction industry.

contacted by P&D. He produced a business card listing the name "Divine"[2] and a cellular phone number. Upon analyzing the billing records for Walker's and Rasberry's cell phones, investigators learned that the "Divine" cell phone number was registered to one Carol Rabb. LRU cross-referenced the number with a minority labor coalition list and discovered that the contact person for P&D went by the name of "Divine Organizer." Moreover, according to billing records, between January and July 2004, over 70 calls were made between the "Divine" number and the numbers belonging to Walker and Rasberry.

On January 19, 2005, with the support of an affidavit from a senior LRU investigator, the People obtained eavesdropping warrants against the Akbar targets, Walker and Rasberry.[3] Shortly after an extension of the Walker/Rasberry warrant was obtained on February 1, 2005, a representative of another construction company advised an LRU investigator that she had been approached by a P&D "business agent" who demanded that she put workers from the community on the job site, and left her his business card, which had the name "CEO Divine Allah" typed on the card and the same cellular phone number given to the other contractor.

After obtaining a second extension against Walker and Rasberry on March 1, 2005, the People obtained an eavesdropping warrant against Rabb on March 31, 2005, setting forth the same goals that they had relative to the Walker/Rasberry investigation: to determine the full scope of Rabb's leadership position in P&D and gather sufficient evidence to prosecute the participants in that illegal conduct. The People later obtained an eavesdropping warrant against Mason's cell phone on November 9, 2005 in furtherance of the same goals.

Defendants were indicted by the New York County grand jury for, among other crimes, enterprise corruption and grand larceny in the second degree. They moved pursuant to CPL 710.20 to suppress evidence obtained from the eavesdropping

---

**2.** Rabb has not contested that he went by the name of "Divine" and, unless otherwise noted, he will be referred to by his real name.

**3.** The application stated that, during the 30-month investigation into Akbar's activities, physical surveillance had been ineffective in discerning the true nature of the relationships Walker and Rasberry had with the contractors, that a grand jury investigation would be futile since the witnesses were either participants in the crimes (who would receive full transactional immunity) or coalition victims wary of retaliation, and that the use of search warrants would be of little help in assisting law enforcement in determining Walker's supervisory role in directing coalition members to violate the law.

warrants, claiming that the March 31, 2005 application for the eavesdropping warrant for Rabb's cell phone—the only application that defendants challenge on this appeal[4]—did not meet the dictates of CPL 700.15 (4). After Supreme Court denied defendants' respective motions, Rabb pleaded guilty to enterprise corruption, grand larceny in the second degree (two counts), attempted grand larceny in the second degree and criminal possession of a weapon in the fourth degree, and was sentenced as a second felony offender to an aggregate term of $8^{1/2}$ to 17 years' imprisonment. Mason pleaded guilty to the same crimes—save for the criminal possession of a weapon charge—and was sentenced as a second felony offender to an aggregate term of $7^{1/2}$ to 15 years' imprisonment. Each defendant appealed the judgment upon his guilty plea to obtain review of the denial of his suppression motion.

The Appellate Division affirmed (66 AD3d 487 [2009]) and a Judge of this Court granted defendants leave to appeal (*People v Mason*, 13 NY3d 940 [2010], 14 NY3d 759 [2010]; *People v Rabb*, 13 NY3d 941 [2010]).

## II.

Criminal Procedure Law § 700.15 (4) provides that an eavesdropping warrant may issue only "[u]pon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ."

In addition, an application for an eavesdropping warrant must contain "[a] full and complete statement of facts" establishing that one of the requirements of section 700.15 (4) has been met (CPL 700.20 [2] [d]). It is not coincidental that the language of the aforementioned CPL provisions is substantively identical to federal standards set forth in 18 USC § 2518 (3) (c) and (1) (c), respectively, since it was the Legislature's intention to "conform 'State standards for court-authorized eavesdropping warrants with federal standards' " (*People v McGrath*, 46 NY2d 12, 26 [1978], *cert denied* 440 US 972 [1979], quoting Governor's Approval Mem, Bill Jacket, L 1969, ch 1147, 1969 NY Legis Ann, at 586; *see United States v Lilla*, 699 F2d 99, 102 [2d Cir 1983]). These statutory requirements ensure that wiretaps are not routinely employed as an initial step in a criminal investigation

---

4. It is defendants' position that, should the March 31, 2005 application fall, so too should the subsequent applications.

and are used only after the applicant states, and the court finds, that the dictates of sections 700.15 (4) and 700.20 (2) (d) have been met (*see generally United States v Giordano*, 416 US 505, 515 [1974] [referencing the federal statutory counterparts to the state provisions]).

The Legislature sought, through its enactment of CPL article 700, to balance competing policies, namely, the protection of "[t]he right of privacy, to which unsupervised eavesdropping poses a great threat . . . against society's interest in protecting itself against crime" (Report of New York State Joint Legislative Committee On Crime, Its Causes, Control & Effect on Society, 1968 NY Legis Doc No. 81, at 44). Significantly, the Legislature took special note of the importance of eavesdropping as it related to organized crime, observing that, "[d]ue to the tight structure of organized crime groups, their use of brutal force to discourage informants, and the high degree to which key members have insulated themselves from criminal liability, standard law enforcement techniques generally result in the conviction of only lower echelon rank and file members" of those groups (*id.*). Then-Governor Rockefeller likewise acknowledged that the eavesdropping law would afford law enforcement "greater flexibility in the employment of eavesdropping as an effective weapon against crime" and, in particular, organized crime, "where the obtaining of evidence for successful prosecutions is often extremely difficult" (Governor's Approval Mem, Bill Jacket, L 1969, ch 1147, 1969 NY Legis Ann, at 586). With those objectives in mind, we now address the merits of defendants' arguments.

## III.

Defendants do not challenge Supreme Court's conclusion that the eavesdropping warrant was issued based upon probable cause; it is evident from this record that the People established probable cause to believe that defendants were committing designated criminal offenses and that communications concerning those offenses would be obtained through eavesdropping (*see* CPL 700.15 [2], [3]). Rather, defendants assert, in essence, that the People improperly utilized eavesdropping as a first step in the Rabb/Mason investigation and failed to provide a particularized showing that normal investigative procedures were unlikely to succeed, relying instead on conclusory statements concerning their experience in the Walker/Rasberry investigation. Defendants further claim that the successful use

of physical surveillance, undercover operations, witness interviews and search warrants in the Walker/Rasberry investigation demonstrated that the warrant application here failed to establish that normal investigative procedures were unlikely to succeed against defendants.

We disagree and conclude that there is record support for the findings by Supreme Court and the Appellate Division that the People's application complied with sections 700.15 (4) and 700.20 (2) (d) (see People v Wheeler, 2 NY3d 370, 373 [2004]). Contrary to defendants' contention, it is evident from the People's application that LRU did not resort to wiretapping as a routine, initial step in its investigation of P&D. The application refers to the May 2004 contact between a P&D representative and a construction contractor, explains that the phone number given to the contractor was registered to Carol Rabb, and states that the LRU's cross-referencing of that number with a list of minority coalitions indicated the name "Divine" and "Divine's" phone number as contact information for P&D. Moreover, LRU's undercover officer, who was posing as a construction contractor, asked Rasberry if there were any other coalitions that could cause trouble at his job site, and Rasberry identified P&D as one of them. Finally, analysis of billing records for the "Divine" cell phone unearthed numerous calls to Walker and Rasberry, calls to construction companies with known ties to organized crime, and calls to construction companies that were also contacted by Akbar.

The application also outlined collusive efforts between Akbar and P&D members. For instance, LRU uncovered evidence that between February 2, 2005 and March 25, 2005, there were 63 calls between Walker's and Rabb's cell phones, some having been intercepted as a result of the Walker eavesdropping warrant. LRU investigators heard Walker and Rabb discussing collusive efforts between Akbar and P&D, including sharing information about job sites and assisting each other's coalitions in coercing construction companies to hire their respective coalition members. At that point in the investigation, it was reasonable for LRU to surmise that Akbar and P&D, although rival coalitions, joined forces when the opportunities presented themselves and that these coalitions shared similar objectives. LRU thereafter tried to identify Rabb by surveilling meetings that had been set up on intercepted calls but these efforts proved unsuccessful. Thus, there is plainly record support that LRU did not resort to eavesdropping as a first step in its investigation

of defendants and, to the extent that defendants disagree with the lower courts' interpretation of the facts in the application, such factual determinations are not further reviewable by this Court (*see People v McRay*, 51 NY2d 594, 601 [1980]).

■ There is likewise record evidence supporting the findings of the lower courts that LRU demonstrated that normal investigative procedures were unlikely to succeed. Although eavesdropping may not be used as a routine first step, law enforcement need not "exhaust all conceivable investigative techniques before resorting to electronic surveillance" (*United States v Concepcion*, 579 F3d 214, 218 [2d Cir 2009]). Indeed, "[a]n affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order *even if every other possible means of investigation has not been exhausted*" (*United States v Terry*, 702 F2d 299, 310 [2d Cir 1983] [emphasis supplied], *cert denied sub nom. Williams v United States*, 461 US 931 [1983]). Nor is law enforcement "required to resort to measures that will clearly be unproductive" (*id.*).

CPL 700.20 (2) requires, among other things, that the applicant advise the authorizing judicial officer of the nature and progress of the investigation along with an explanation as to what investigative techniques have been tried and failed or why it would be difficult to employ normal law enforcement techniques. This language "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime" (*United States v Kahn*, 415 US 143, 153 n 12 [1974] [discussing 18 USC § 2518 (1), the federal statutory counterpart to CPL 700.20 (2)]). Of course, the application must include more than "generalized and conclusory statements that other investigative procedures would prove unsuccessful" (*Lilla*, 699 F2d at 104).

Here, the People provided "some basis for concluding that less intrusive investigative procedures [were] not feasible" (*United States v Howard*, 350 Fed Appx 517, 519 [2d Cir 2009]). For instance, the LRU investigator explained that physical surveillance was of limited use because, although it might show subjects meeting with each other, it would rarely allow LRU to hear the conversations, and that any attempts by LRU investigators to get closer to the subjects to hear the conversations would render it more likely that the subjects would discover they were under investigation. He explained that, notwithstanding the undercover role he had assumed as a contractor—which was

limited to his paying Rasberry $800 a month—other undercover efforts would not have enabled LRU to expose the full scope of Akbar's activities, and were unlikely to be more successful with P&D. The application further explained the futility of conducting a grand jury investigation because many of the witnesses were participants in the criminal conduct, and victims of that conduct would be unlikely to testify out of fear of retaliation. Furthermore, the issuance of grand jury subpoenas to witnesses and custodians of business records would publicize the investigation, thereby foreclosing the use of other conventional investigatory techniques. Finally, the execution of search warrants would compromise the confidentiality of the investigation and assuredly apprise its targets, increasing the likelihood that they would destroy inculpatory records.

Because the People supported their application with reasons why normal investigative techniques would be ineffective as to Rabb, it is of no moment that they also utilized their experiences from the Walker/Rasberry investigation to inform their allegations against P&D. Contrary to defendants' contentions, the People did not seek to eavesdrop based solely and primarily on how Akbar operated; the People had learned, through their interception of Walker/Rasberry conversations with P&D, the collusive nature of the relationship between Akbar and P&D, how P&D operated its business, and the similarity of their organizations and objectives. Therefore, it cannot be said that the People relied solely on past investigations into minority labor coalitions in general to support their assertion that normal investigative techniques would be generally unproductive in the P&D investigation (*see United States v DiMuro*, 540 F2d 503, 510-511 [1st Cir 1976], *cert denied* 429 US 1038 [1977]).

Equally unavailing is defendants' argument that, because normal investigatory measures had succeeded in the Walker/Rasberry investigation—including the use of physical surveillance, undercover operations, witness interviews and search warrants—the warrant application failed to establish that normal investigative measures were unlikely to succeed. The People explained why normal law enforcement techniques would be unlikely to succeed as against these defendants and there was a factual basis for these assertions. "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely" (*Concepcion*, 579 F3d at 218 [citation and internal quotation marks omitted]).

## IV.

Upon conducting our limited review, we are satisfied that there is record support for the conclusions reached by the lower courts that the People's application demonstrated that normal investigative measures would reasonably have been unlikely to succeed if tried. Accordingly, in each case, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). In 1967, the United States Supreme Court struck down New York State's eavesdropping statute as unconstitutional (*Berger v New York*, 388 US 41 [1967]). More than adumbrating what it would do only months later when it issued its decision in *Katz v United States* (389 US 347 [1967]) overruling *Olmstead v United States* (277 US 438 [1928]), the *Berger* Court held that electronic eavesdropping constituted a search within the meaning of the Fourth Amendment (*Berger*, 388 US at 52-53) and, accordingly, that when the government sought to listen to the private conversations of its citizenry it was obliged first to obtain a warrant from a neutral magistrate issued upon probable cause supported by oath or affirmation, and particularly describing the object of the contemplated intrusion. It followed as well that fruits of unauthorized eavesdropping were subject to the exclusionary rule, which by the time of *Berger* had been applied to the states (*id.* at 53, citing *Mapp v Ohio*, 367 US 643, 655 [1961]).

The New York statute challenged in *Berger* was deemed facially deficient on numerous grounds, but principally for its failure to meet the Fourth Amendment's requirement of particularity and for the open-ended authority it conferred upon a successful eavesdropping applicant (388 US at 58-59). These inadequacies were specially troubling given eavesdropping's "inherent dangers" (*id.* at 60). The practice, the Court noted, had been historically disfavored and, indeed, universally outlawed, except for law enforcement purposes (*id.* at 45-49), in which context it remained highly problematic by reason of its unusually intrusive, indiscriminate and insidious capacities. While acknowledging the representations of numerous highly respected prosecutors as to the utility of electronic eavesdropping, particularly in the investigation of organized crime (*id.* at 60-62), the Court responded,

> "we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement. This is no formality that we require today but a fundamental

rule that has long been recognized as basic to the privacy of every home in America. While '(t)he requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement,' *Lopez* v. *United States*, *supra*, at 464 (dissenting opinion of BRENNAN, J.), it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. *Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be developed that will operate just as speedily and certainly and—what is more important—without attending illegality*" (*id.* at 62-63 [emphasis added]).

Responding to *Berger*'s constitutionally based concerns and holding, Congress in 1968 enacted title III of the Omnibus Crime Control and Safe Streets Act (codified at 18 USC § 2510 *et seq.*), setting forth baseline standards governing the issuance of eavesdropping warrants (18 USC § 2518) and making those standards applicable to the states (18 USC § 2516 [2]) while permitting them to enact still more restrictive provisions (*id.*). To the extent, then, that the New York Legislature one year later, in enacting New York's conforming electronic eavesdropping statute (subsequently codified as CPL article 700) engaged in any balancing of the relevant competing interests, the exercise was largely academic; the essential balancing had already been performed by the Supreme Court and Congress. The State Legislature, as noted, had the option of being more protective of personal privacy than Congress had been, but it retained no power to alter the balance struck at the federal level in the opposite direction. It is suggested that New York's eavesdropping statute was motivated by some policy to make eavesdropping more readily available in the investigation of organized crime. But the thrust of *Berger* was in precisely the opposite direction, and, in fact, the ensuing federal enactment, to the extent here relevant, contained no special dispensation for organized crime investigations. Rather, that enactment and its New York analogue, in undoubted recognition of the "inherent

dangers" of electronic eavesdropping (*see Berger*, 388 US at 60, 62) insufficiently appreciated in New York's former eavesdropping statute, contain what to all appearances are uniformly applicable presumptions against resort to eavesdropping that can be overcome only when the proponent of electronic surveillance proffers "a full and complete statement" of facts establishing either that normal, less intrusive investigative techniques have been tried and have failed, or that they reasonably appear unlikely to succeed in uncovering the sought evidence (18 USC § 2518 [1] [c]; CPL 700.15 [4]; 700.20 [2] [d]).[1] The question now presented is whether the affidavit offered in support of the application for the subject eavesdropping warrant, issued March 31, 2005, met this condition with respect to defendant Rabb.[2]

Permission to tap the cell phone subsequently found to have been used by defendant Rabb was sought after a long pending and then still ongoing investigation of a minority labor coalition known as Akbar's Community Services (Akbar) and its principals Derrick Walker and Frederick Rasberry, involving witness interviews, document review, visual surveillance, undercover work, search warrant execution and, finally, electronic eavesdropping, disclosed that a cell phone in the name of one Carol Rabb was being used by an individual then identified only as "Divine" to communicate respecting racketeering related activities in which the user was evidently involved. It was thought based on information obtained in the course of the Akbar investigation, most notably phone records and conversations intercepted under eavesdropping warrants pertaining to the cell phones used by Walker and Rasberry,[3] that "Divine" was a leader of P&D Construction Workers (P&D). Although little was actually known about P&D, it appeared that it was a fledgling minority labor coalition in competition with the better established

1. The presumption may also be overcome by a showing that "normal" investigation would be too dangerous, but that ground is not here raised.

2. In the course of the electronic surveillance conducted pursuant to the March 31, 2005 warrant's authority investigators became aware of the cell phone whose use was eventually traced to defendant Mason. Permission to eavesdrop on the Mason phone was sought in subsequent warrant applications. Inasmuch, however, as those subsequent warrants were premised upon information obtained pursuant to the March 2005 warrant authorizing the tap of the "Divine" cell phone, the crucial predicate for the disposition of each appellant's suppression motion was that set forth in the supporting March 31, 2005 affidavit.

3. The validity of these warrants is not here at issue.

Akbar and that it was to some unascertained extent involved in corrupt practices.[4]

Authorization to eavesdrop on the "Divine" cell phone, used under an account in the name of Carol Rabb, was first sought in March 2005 in the context of an application seeking to extend the previously issued Walker and Rasberry eavesdropping warrants. The applicant's supporting affidavit, dated March 31, 2005, contains extensive analysis of phone records and lengthy excerpts of conversations intercepted on the Walker and Rasberry cell phones purporting to demonstrate in accordance with the requirements of CPL 700.15 (2) and (3) that there was probable cause to believe that the investigation's targets were committing specified crimes and that particular communications respecting the suspected crimes would be captured through the sought eavesdropping. The sufficiency of these probable cause allegations is not the issue before us; it is, rather, the adequacy of the immediately following allegations purporting to demonstrate the need for eavesdropping. Those allegations, under the heading "THE NEED FOR EAVESDROPPING," occupying only 3½ of the affidavit's 64 pages, are notably general and conclusory, and make virtually no attempt to differentiate between the long-standing Akbar investigation and its corporeal targets and the practically nascent investigation into P&D and its supposed leader "Divine." They are, in fact, barely distinguishable from those comprising "THE NEED FOR EAVESDROPPING" section of the affidavit filed in support of the March 1, 2005 eavesdropping extension application, which targeted only the Walker and Rasberry cell phones; the relevant paragraphs of the March 31, 2005 application differ from those of the March 1 application only in their occasional, unelaborated references to "Divine" or "P&D."

Apart from noting "a number" of attempts during the preceding month at identifying "Divine" through visual surveillance of meetings between Walker and Rasberry and their associates, the affidavit does not trouble to show in accordance with the first prong of CPL 700.15 (4) that, with respect to P&D and "Divine," "normal investigative procedures [had]

---

4. The majority takes considerable liberty when it attributes to the People at the time of the warrant application knowledge of "how P&D operated its business" (majority op at 154). Virtually nothing was known about P&D's structure or operations at that time.

been tried and [had] failed."[5] The affidavit instead appears to address itself to the statute's alternative prong under which the requisite showing of need can be premised on a demonstration that "normal investigative procedures . . . reasonably appear to be unlikely to succeed if tried." In this connection, the affiant alleges as he had previously, almost completely without particular reference, that although physical surveillance might establish "some useful facts" it would be inadequate to achieve the investigation's goals and might risk the investigation's secrecy as investigators attempted to draw near to the targets of their scrutiny; that eavesdropping is necessary because the targeted corrupt activities are widespread and involve numerous participants, and because victims of those activities would likely be afraid to testify; that, although the affiant in an undercover capacity had succeeded in transacting illicit business with Rasberry, additional undercover efforts would be impracticable because the members of "this group" had long time associations and family connections precluding the insertion of a government agent; that a grand jury investigation would be futile because witnesses would be afraid to testify and, if they did, would have to be granted immunity; that grand jury subpoenas would tip off the investigation's targets, foreclosing other conventional avenues of inquiry; and, that the execution of search warrants would be "premature" and would likely result in the destruction of valuable evidence. The relevant portion of the affidavit concludes that evidence necessary for the successful investigation of "this case," meeting the goals of "this investigation," can only be obtained through electronic surveillance.

The sought warrant was granted by a Justice of the Appellate Division, Second Department, and thereafter upheld by Supreme Court and the Appellate Division, First Department, over claims by both appellants that the need for eavesdropping on their cell phones had not been made out in accordance with the requirements of CPL 700.15 (4) and 700.20 (2) (d) by the March 31, 2005 warrant applicant. This Court now affirms upon

---

5. While the majority finds relevant the additional circumstance that a "Divine" business card had, during the Akbar investigation, been obtained from a contractor who claimed that it had been left with her by a P&D agent who demanded that community workers be employed at her work site, the affiant apparently did not deem this transaction pertinent to his explanation of the need for eavesdropping. This is understandable since the receipt of the business card and its ensuing use in identifying P&D as an investigative target in no way showed that eavesdropping was necessary.

the ground that there is record support for the conclusions of those courts. Supreme Court, however, never found that there had been an individualized showing that ordinary investigative techniques would likely be unavailing with respect to "Divine" and P&D. In denying defendant Rabb's suppression motion, it found instead that such a showing was unnecessary because the futility of ordinary investigative measures had been shown with respect to Walker and Rasberry, and "Divine" was allegedly engaged in the same type of criminal activity.[6] The Appellate Division affirmed without making any additional factual findings. It refined the rationale of Supreme Court only to the extent of theorizing that "[t]he affiant's reliance on experience obtained in a closely related investigation into similar activities by other suspects [Walker and Rasberry] was proper, because the affidavit was sufficiently specific in showing the connection between the two investigations" (66 AD3d 487, 488 [2009]). To the extent, then, that this Court now affirms upon the ground that there were findings specific to Rabb and P&D to support the conclusion that normal investigative methods would likely be futile as to them, it acts as a factfinder in excess of its jurisdiction; no court has to this point upheld the challenged warrant upon such grounds.

The reason for this is that the warrant application simply does not state, much less state "fully and completely," why normal investigative techniques would not likely be useful in obtaining evidence implicating the "Divine" cell phone user and P&D in corrupt labor practices. What it does do is reiterate, practically verbatim, a summary explanation of why normal investigative methods would not be productive with respect to Akbar and its principals—an explanation whose sufficiency did not rest upon the affidavit's assemblage of generic assertions

---

**6.** Supreme Court stated:
"The People did not have to conduct a preliminary investigation of defendant as a prerequisite to establishing that normal investigative procedures could not be utilized to investigate defendant's alleged criminal conduct. The People had already shown that such measures had been tried and failed or that they reasonably appeared to be unlikely to succeed if employed against Walker and [Rasberry]. Defendant allegedly engaged in the same type of criminal enterprise and criminal activity as that allegedly engaged in by defendants Walker and [Rasberry]. Under those circumstances, the People were not required to make a more individualized showing that such measures would be unlikely to succeed against defendant or that such measures had been attempted and failed."

respecting "THE NEED FOR EAVESDROPPING," but upon the elsewhere documented 30-month history of the Akbar investigation, in which ordinary investigative methods had been extensively used. There, of course, was no remotely comparable history to recount with respect to the newly commenced investigation of "Divine" and P&D, and in its absence the affidavit's pat recitation of difficulties endemic to organized crime probes was patently insufficient to explain why ordinary investigative means would likely be fruitless with respect to "Divine" and P&D.

In view of the circumstance that the baseline standard for a showing of necessity in justification of electronic eavesdropping is federal, it is clear that the decisions of the federal courts applying that standard are of special relevance to our inquiry, which, minimally, must be whether there is evidence to permit the inference that the federally compelled standard has been satisfied. The People agree that this is so and list in a decontextualized way numerous bromides to demonstrate that necessity is not a rigorous requirement, but merely one that may be met by a showing that electronic surveillance is not being "routinely employed as the initial step in criminal investigation" (*United States v Giordano*, 416 US 505, 515 [1974]). We are in this vein reminded that resort to traditional investigative methods need not be exhaustive (*see United States v Robledo*, 254 Fed Appx 850 [2d Cir 2007]), or entirely useless (*see United States v Maxwell*, 25 F3d 1389, 1394 [8th Cir 1994]), before a wiretap may be deemed necessary, and that an investigator's prior experience may have relevance to a judgment that less intrusive investigative techniques would not be efficacious (*see United States v Ashley*, 876 F2d 1069, 1072 [1st Cir 1989]). It is in addition impressed upon us that the federal cases employ a "common sense approach" in evaluating the government's assessment of the utility of alternative investigative methods (*see United States v Blackmon*, 273 F3d 1204, 1207 [2001]). But none of these maxims have actually been applied as the People essentially contend they should be here, effectively to relieve a warrant applicant of the burden of specifying why less intrusive alternatives to eavesdropping would be unavailing in advancing the investigation of a particular target. That electronic surveillance is not the very first step in an investigation is not license for it to be the second or third step; such a literal-minded

application of *Giordano*'s dictum to effectively supplant the statutory requirement was never intended.[7]

It is true that the applicant need not show that alternative methods have actually been tried and have failed, but in lieu of demonstrating necessity by that means, there must, if the necessity requirement is not to be rendered practically nugatory, be some equivalently "full and complete" explanation under the statutory second prong as to why the use of traditional methods would be ineffective to meet reasonably defined investigational objectives. What is required is a factually detailed statement "establishing" (CPL 700.20 [2] [d]) that the evidence sought through a particular wiretap, or its probative equivalent, is not reasonably likely to be acquired through "normal" means. This was never provided as to "Divine" and P&D, and until now was never found to have been. Rather, what was found was that necessity had been shown to justify the Walker and Rasberry wiretaps and that because Akbar and P&D were similar, or because their investigations were connected, the necessity predicate as to the Akbar principals could be transferred to justify the tapping of the cell phones of P&D principals. The legal issue before us is the propriety of that predicate transfer. This is not a mixed question of law and fact, but entirely one of law as to which federal cases have spoken with great clarity.

In *United States v Santora* (600 F2d 1317 [9th Cir 1979]), the court reviewed eavesdropping warrants issued in connection with an investigation into a numerously populated conspiracy to traffic in stolen airline tickets. Although upholding the electronic surveillance warrants initially issued in the investigation, the court found that the need for certain additional wiretaps subsequently authorized within the same investigation had not been sufficiently made out. It noted that the validity of the prior wiretap authorizations did not entitle the government

---

7. This is clear when the quotation is read in context:

"Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. *Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous*" (416 US at 515 [emphasis added]).

to "dispense with the required showing when applying to tap the telephones of other conspirators" and quoted *United States v Abascal* (564 F2d 821, 826 [9th Cir 1977]) for the proposition that "[i]t is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy. Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another" (600 F2d at 1321). Similarly, in *United States v Gonzalez, Inc.* (412 F3d 1102 [9th Cir 2005]), the validity of prior eavesdropping warrants issued in connection with an investigation into an immigration smuggling ring, permitting the tapping of certain phones at a bus terminal, was held insufficient to demonstrate the necessity of subsequent wiretaps placed on phones at a different location:

> "[the government] attempted to shoe-horn the significant investigatory work the government conducted before applying for the Terminal wiretap into its application for the Blake Avenue wiretap. *But the government is not free to transfer a statutory showing of necessity from one application to another—even within the same investigation. This court has held that an issuing judge may not examine various wiretap applications together when deciding whether a new application meets the statutory necessity requirement. Each wiretap application must separately satisfy the necessity requirement*" (*id.* at 1115 [emphasis added]).

Here, while we deal with what in the investigator's eyes was one investigation into the corrupt practices of minority labor coalitions, the investigation, objectively, had numerous distinct targets. P&D and Akbar were separate, indeed by the People's description, rival, entities. While they may have shared similar goals for their respective memberships and leaders, and there was some evidence that they occasionally colluded, there was no basis to suppose that they were part of a single overarching criminal conspiracy or enterprise. Moreover, even if there had been, it is clear from *Santora* and *Gonzalez* that the showing of necessity made in justification of the Akbar wiretaps was not transferrable to support the P&D wiretaps. Indeed, the showing of necessity made with respect to Walker and Rasberry would not even have been transferrable to justify eavesdropping on the phones of other Akbar principals.

That normal means had, after extensive and often useful application, reached a point of diminishing returns in the Akbar

investigation, did not "establish" that such means were unlikely to be productive in the relatively recently commenced investigation of P&D and its principals. If the two entities were comparable as the People contend, the early success of the Akbar investigation using ordinary means of inquiry, would seem to suggest that such means would have been similarly efficacious in the early stages of the P&D investigation. If, on the other hand, the entities were, as defendants contend, quite different, there would appear to be no ground to suppose that the experience in investigating Akbar had much predictive value in assessing the utility of "normal" techniques in the investigation of P&D. It is, in any case, not consistent with the constitutionally grounded statutory presumption against electronic eavesdropping that there should be a proliferation of wiretaps based upon necessity findings turning on the mere relatedness or similarity of investigations or their targets. If that were permitted, wiretapping would, in a broad range of situations defying judicial containment, routinely become among the first investigative means employed, rather than a necessary supplement to ordinary, less intrusive measures.

It does not seem to me wise to avoid this squarely presented problem, and particularly to do so by denominating the legal issue before us as a "mixed question." Today's decision, while perhaps narrowly intended, will, given its factual underpinning, be taken as granting broad permission to dispense with the necessity requirement in a wide range of circumstances based simply upon the supposed similarity of targets or the connectedness of investigations. These theories undeniably have their attraction; it may well seem a foregone conclusion borne out by an investigator's experience in probing other apparently similar criminal enterprises that the entity with which he or she is now confronted will not be amenable to penetration by ordinary means and that the investigation's ultimate objective—the complete extirpation of the criminal organism's many roots and tendrils—will not be achievable except with the aid of electronic surveillance. But it is in this context a court's obligation under the law to check the impulse toward the expedient use of wiretaps and remind those in the often competitive business of ferreting out crime that the

"fact 'that traditional investigation methods do not reveal all [is a] generic problem[ ] of police investigation [and that its] generic nature does not dissipate

simply because the government claims a vast investigative purpose . . . The government may not cast its investigative net so far and wide as to manufacture necessity in all circumstances' " (*United States v Gonzalez, Inc.*, 412 F3d at 1114-1115, quoting *United States v Blackmon*, 273 F3d at 1211).

Because I believe that the tack now taken by this Court affords government a net far more capacious than the law permits, either in its federal or conforming state iteration, I would reverse, grant the motions for suppression of communications obtained by means of the wiretaps authorized in reliance upon the March 31, 2005 warrant, and remit the matters for further proceedings.

Judges Graffeo, Read and Smith concur with Judge Pigott; Chief Judge Lippman dissents and votes to reverse in a separate opinion in which Judges Ciparick and Jones concur.

In each case: Order affirmed.